# EXHIBIT A

## FLEXA EMPLOYMENT AGREEMENT

This FLEXA EMPLOYMENT AGREEMENT (the **"Agreement"**) is dated this June 1, 2018 (the **"Effective Date"**), and is between Flexa Technologies LLC, a Delaware limited liability company (the **"Company"**) and Scott Mandel (**"Executive"**).

NOW THEEFORE, in consideration of the premises and the mutual covenants and agreements contained in the Agreement and intending to be legally bound, the parties hereto agree as follows:

## SECTION 1.    CAPACITY AND DUTIES

1.1    Employment; Acceptance of Employment.  The Company hereby employs Executive, and Executive hereby accepts employment by the Company, for the period and upon the terms and conditions set forth in the Agreement.

1.2    Capacity and Duties.

(a)    Executive shall serve as Director of Community of the Company and of such Affiliates of the Company as are designated by the Board. Executive shall have such duties and authorities consistent with such position.

(b)    Executive (i) shall devote his or her full working time, energy, skill, and best efforts to the performance of his or her duties set forth in the Agreement, in a manner that will faithfully and diligently further the business and interests of the Company and its Affiliates, and (ii) shall not be employed by or participate or engage in or in any manner be a part of the management or operation of any other business enterprise unless disclosed on the Authorized Outside Business Activities list that is attached hereto as Addendum A, or that is separately authorized in writing by the Board at a later date, which authorization shall become Addendum B to this Agreement.

## SECTION 2.    TERM OF EMPLOYMENT

2.1    Term.  The initial term of Executive's employment under the Agreement shall be one (1) year commencing on the Effective Date (the **"Initial Term"**) and thereafter shall automatically be renewed from year to year, unless and until either party shall give notice of their election to terminate Executive's employment at least 30 days prior to the end of the then current term (the Initial Term together with any renewal term, the **"Term"**; the Term shall be deemed for all purposes to have terminated on the date that Executive's employment with the Company terminates). If notice of termination is given in accordance with the Section 2.1, the Company shall not thereafter be obligated to make any further payments or provide any benefits to Executive pursuant to the Agreement other than (i) any salary, bonus and expense reimbursement that has been fully earned by, but not yet paid to, Executive under the Agreement as of the date of such termination, which amounts will be paid on the next regularly scheduled payment date for such items, and (ii) as otherwise required by applicable Law. Nothing in the

Section 2.1 shall limit any party's right to terminate Executive's employment in accordance with Section 4.

      2.2    Key-Man Insurance. Executive agrees to submit to such physical examinations, tests and interviews as may be reasonably requested by the Company (at Company expense) for purposes of obtaining key-man insurance covering the Executive.

## SECTION 3.    COMPENSATION

      3.1    Base Compensation. As compensation for Executive's services under the Agreement during the Term, the Executive shall be paid $100,000 U.S. Dollars, which shall be paid in periodic installments in accordance with the Company's regular payroll practices in effect.

      3.2    ICO Bonus. Executive shall be eligible to receive a one-time Initial Coin Offering Bonus of 2,857,142,860 Flexacoins ("FXC") within thirty (30) days of the close of the Company's Initial Coin Offering and following Board approval. In the event any Board member(s) are added to the Company's Board after the date of this Agreement that could prohibit approval of this ICO Bonus, then the Company agrees that said ICO Bonus shall be due and owing to Executive in accordance with the terms and conditions of this Agreement.

      3.3    Employee Benefits. Executive shall be eligible to participate in all of the Company's benefit programs, in accordance with the terms of such programs as in effect from time to time, that is offered to all of the Company's executive employees with comparable levels of responsibility and compensation from time to time. These benefits shall include, but not be limited to, health insurance, life insurance, disability insurance, and participation in the Company's profit-sharing, 401(k), or any other retirement savings plan.

      3.4    Vacation. Executive shall be entitled to a paid vacation in accordance with Company policy during the Term of his or her employment, which shall in no case be less than twenty (20) days of paid vacation per year. Earned but unused vacation days will not be eligible to be carried over to the next calendar year and such unused days shall be forfeited by Executive at the end of the calendar year and upon separation from the Company for any reason, unless otherwise prohibited by applicable Law.

      3.5    Expense Reimbursement. During the Term, the Company shall reimburse Executive for all reasonable expenses he or she incurs in connection with the performance of his or her duties in accordance with the Company's regular reimbursement policies as in effect from time to time and upon receipt of itemized vouchers and such other supporting information as required by the Company's policies.

## SECTION 4.    TERMINATION OF EMPLOYMENT

      4.1    Death of Executive. Upon Executive's death, Executive's employment with the Company shall terminate immediately. The Company shall not thereafter be obligated to make any further payments or provide any benefits to Executive other than (i) any salary, bonus

and expense reimbursement that has been fully earned by, but not yet paid to, Executive under the Agreement as of the date of such termination, which amounts will be paid on the next regularly scheduled payment date for such items, and (ii) as otherwise required by applicable Law.

       4.2    <u>Disability of Executive</u>.  If Executive becomes Disabled during the Term, then Executive's employment with the Company shall terminate immediately upon notice to Executive, in which event, the Company shall not thereafter be obligated to make any further payments or provide any benefits to Executive other than (i) any salary, bonus and expense reimbursement that has been fully earned by, but not yet paid to, Executive under the Agreement as of the date of such termination, which amounts will be paid on the next regularly scheduled payment date for such items, (ii) benefits under any policies of disability insurance, if any, and (iii) as otherwise required by applicable Law. "**Disabled**" means either (x) the definition of disability set forth in any disability insurance policy under which Executive is the insured held by the Company at the time of the termination pursuant to the Section 4.2, or (y) if no such policy is in effect at such time, Executive, in the reasonable opinion of the Managers and subject to applicable Law, is, or has been unable, due to a physical, mental or emotional illness or condition of Executive, to materially perform his or her duties under the Agreement for a period of 90 consecutive days or 120 days during any period of 180 consecutive days.

       4.3    <u>Termination for Cause</u>.  If the Company delivers a notice to Executive that the Company is terminating Executive's employment for Cause, which notice shall set forth in reasonable detail the Company's reasons therefor, then Executive's employment with the Company shall terminate immediately. However, if such termination is pursuant to <u>Section 4.3(d) or (e)</u> and Executive shall have never received a prior termination notice with respect to <u>Section 4.3(d) or (e)</u>, Executive's employment with the Company shall terminate upon the 30th day following delivery of such notice if Executive has not cured the Cause set forth in the notice within such 30 day period. Upon any such termination, the Company shall not be obligated to make any further payments to Executive other than (i) salary and expense reimbursement that have been fully earned by, but not yet paid to, Executive under the Agreement as of the date of such termination, which amounts will be paid on the next regularly scheduled payment date for such items, and (ii) as otherwise required by applicable Law. As used in the Agreement, "**Cause**" shall mean the following:

          (a)    participating in a criminal act or fraud in performance of his or her duties for the Company, and/or theft, misappropriation and/or embezzlement of funds from the Company or its Affiliates, in each case, that the Board in good faith believes to have occurred;

          (b)    engaging in any act of discrimination, retaliation or sexual or other unlawful harassment that the Board in good faith believes to have occurred;

          (c)    Executive's conviction or plea of no contest with respect to any felony;

(d)     violation of any material duty or obligation under the Agreement, of any material Company policy, or of any express direction or any rule or regulation reasonably established by the Board;

(e)     gross misconduct in the performance of, or neglect of, Executive's duties; or

(f)     the unlawful use (including being under the influence) or possession of illegal drugs by the Executive on the premises of the Company or any of the Company's Affiliates while performing any duties or responsibilities with the Company or any of the Company's Affiliates.

4.4     <u>Termination Without Cause</u>.   The Board may terminate Executive's employment with the Company without Cause upon 30 days' prior written notice of the date of such termination.  The Company shall not thereafter be obligated to make any further payments or provide any benefits to Executive other than (i) any salary, bonus and expense reimbursement that have been fully earned by, but not yet paid to, Executive under the Agreement as of the date of such termination, which amounts will be paid on the next regularly scheduled payment date for such items, and (ii) as otherwise required by applicable Law. In addition, in exchange for Executive executing a separation agreement (in the form provided by the Company to Executive within 7 days of the date such notice is given to Executive and containing a release of claims in favor of the Company and its Affiliates (the "**Release**")) within the applicable period under the federal Age Discrimination in Employment Act (currently, either 21 or 45 calendar days) and not subsequently revoking the Release, and complying with the terms of the Agreement, including but not limited to the provisions in <u>Section 5</u>, the Company shall pay Executive an amount equal to six (6) months of the Base Salary at the annual rate being paid at the date of termination of employment under <u>Section 3.1</u>, in periodic installments in accordance with the Company's regular payroll practices in effect from time to time ("**Severance Pay**"). Subject to <u>Section 6.2</u>, the payments of Severance Pay under the Section shall commence on the first regular pay day immediately following the end of the seven-day Release revocation period in respect of the Release. Upon making the required payments in accordance with the <u>Section 4.4</u>, the Company shall have no further obligation to Executive.

4.5     <u>Termination By Executive for Good Reason</u>.  Executive may terminate his or her employment with the Company on written notice to the Company for "**Good Reason.**" Good Reason means: (a) a material diminution in Executive's duties as an employee of the Company and its Affiliates; (b) any change in Executive's duties that requires Executive to relocate from Executive's primary office in New York, NY, to a location other than the location of Executive's primary office as of the Effective Date; or (c) a reduction by the Company of the base salary paid to Executive. The Company shall not thereafter be obligated to make any further payments or provide any benefits to Executive other than (i) any salary, bonus and expense reimbursement that have been fully earned by, but not yet paid to, Executive under the Agreement as of the date of such termination, which amounts will be paid on the next regularly scheduled payment date for such items, and (ii) as otherwise required by applicable Law. In addition, in exchange for Executive executing the Release within the applicable period under the federal Age Discrimination in Employment Act (currently, either 21 or 45 calendar days) and not

subsequently revoking the Release, and complying with the terms of the Agreement, including but not limited to the provisions in <u>Section 5</u>, the Company shall pay Executive Severance Pay. Subject to <u>Section 6.2</u>, the payments of Severance Pay under the Section shall commence on the first regular pay day immediately following the end of the seven-day Release revocation period in respect of the Release. Upon making the required payments in accordance with the <u>Section 4.5</u>, the Company shall have no further obligation to Executive.

   4.6 <u>Termination by Executive Without Good Reason</u>. The Agreement and Executive's employment with the Company will terminate automatically upon the voluntary termination of the employment of Executive. Upon such termination, Executive will only be entitled to receipt of (i) any salary, bonus and expense reimbursement that have been fully earned by, but not yet paid to, Executive under the Agreement as of the date of such termination, which amounts will be paid on the next regularly scheduled payment date for such items, and (ii) as otherwise required by applicable Law.

## SECTION 5.  RESTRICTIVE COVENANTS

   5.1 <u>Confidentiality</u>.

   (a) Executive shall not, either during or after her employment with the Company and its Affiliates, directly or indirectly, use, publish, or otherwise disclose or divulge to any third party any Confidential Information other than as required by Law or as required to perform Executive's duties under the Agreement during the Term. For purposes of the Agreement, "**Confidential Information**" includes any trade secrets or confidential or proprietary information of the Company or any of its Affiliates (in any medium) including, without limitation, any such information concerning customers, vendors, services, products, processes, pricing policies, business plans, records, invoices, customer correspondence, orders, computer records or software, technical or financial information or data, mailing or telephone or customer lists or any information relating to the sales or customer history or business prospects of the Company or any of its Affiliates and further includes, without limitation, all unpublished information and all information and data, inventions or systems that are not generally known by the industry in which the Company and its Affiliates operate, but excludes information that (i) is generally available to and known within the industry of the Restricted Business through no fault of Executive or (ii) is lawfully acquired or developed by Executive after the termination of her employment with the Company and its Affiliates from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. Moreover, if Executive is compelled to disclose any Confidential Information by judicial or administrative process or by othe requirements of Law, Executive shall promptly notify the Company in writing and shall disclose only that portion of such Confidential Information which Executive is compelled to disclose, at the advice of Executive's counsel; provided that (A) to the extent possible, the Company is first given notice of the required disclosure and an adequate opportunity to seek appropriate legal relief to prevent such disclosure or limit use and further disclosure of the information required to be disclosed, and (B) Executive provides such cooperation as the Company shall reasonably request.

   (b) Executive shall not, either during or after the Term, directly or indirectly, copy, reproduce or remove from the Company's or any of its Affiliates' premises,

except as required to perform Executive's duties under the Agreement during the Term, any Confidential Information.  In addition, all documents, files and records, and all other memoranda, notes, files, lists and other documents made, compiled or otherwise acquired by Executive in the course of her employment with the Company and any of its Affiliates are and shall remain the sole property of the Company and/or its Affiliates (whether deemed Confidential Information or not) and all originals and copies thereof shall be delivered to the Company upon termination of Executive's employment for whatever reason or at such earlier time as the Company may request.

(c)     Executive recognizes that the Company and its Affiliates have received and in the future will receive from third parties (including customers of the Company) their confidential or proprietary information subject to a duty on the part of the Company and its Affiliates to maintain the confidentiality of such information and to use it only for certain limited purposes.  Executive shall hold all such confidential or proprietary information in the strictest confidence and shall not disclose it to any Person or to use it except as provided above or as necessary in carrying out Executive's work for the Company and its Affiliates consistent with the Company's or its Affiliates' agreement with such third party.

5.2     Inventions and Improvements.  During the Term, Executive shall promptly communicate to the Company all ideas, knowledge, discoveries, inventions and improvements related exclusively to the Restricted Business (collectively, "**Inventions and Improvements**") that are or may be useful to the Company or Affiliates in their business. Executive acknowledges that Inventions and Improvements that are made, conceived or reduced to practice by him or her that relate to the Company's or its Affiliates' business and every item of non-public knowledge relating to the Company's or its Affiliates' business gained by him or her during his or her employment are the property of the Company or its Affiliates (including but not limited to such Inventions and Improvements made, developed or otherwise conceived by Executive that are related to the Company's business prior to the Effective Date), and Executive irrevocably assigns all such Inventions and Improvements to the Company for its sole use and benefit, without additional compensation. The provisions of the Section 5.2 shall apply whether such Inventions and Improvements are conceived, made or gained by him or her alone or with others, whether during or after usual working hours, whether on or off the job, and whether or not within the specific realm of his or her duties. It shall be rebuttably presumed that Inventions and Improvements relating to the Company's or its Affiliates' business conceived during the 6 months following termination of Executive's employment are, for the purposes of the Agreement, conceived before the termination of his or her employment. Executive shall, upon request of the Company, at any time during or after the Term, sign all instruments and documents requested by the Company and otherwise cooperate with the Company to protect its right to such Inventions and Improvements, including applying for, obtaining and enforcing patents and copyrights thereon in any and all countries. Notwithstanding any contrary implication of the foregoing, no provision in the Agreement requires Executive to assign any of his or her rights to any Inventions and Improvements for which no equipment, supplies, facility or trade secret information of the Company or its Affiliates was used and which was developed entirely on Executive's own time, unless the Invention and Improvement relates to the Restricted Business.

5.3     Non-Competition.  During Executive's employment with the Company and for one (1) year thereafter, regardless of the reason for his or her separation and whether

caused by the Company or Executive (the "**Restricted Period**"), Executive shall not, and shall not permit any of her Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in the Restricted Business in the Territory; (ii) have an interest in any Person (other than a direct or indirect interest in the Company or its Affiliates) that engages directly or indirectly in the Restricted Business in the Territory in any capacity, including as a partner, shareholder, member, lender, employee, principal, agent, trustee or consultant; or (iii) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the Effective Date) between the Company or its Affiliates and any customers or suppliers of the Company or its Affiliates. Notwithstanding the foregoing, Executive may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Executive or any of her Affiliates is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 2% or more of any class of securities of such Person.  As used herein, "**Restricted Business**" shall mean any business activity relating to or involving cryptocurrency payment processes or facilitation and/or constructing, developing and/or assisting with the creation of a mobile payment solution utilizing cryptocurrencies; and, during the Restricted Period, Executive shall specifically not be permitted to accept any employment position with Bitpay, Coinbase Commerce or any company that offers products or services similar to those companies. "**Territory**" means wherever in the world that the Company or any of its Affiliates engages in the Restricted Business at the time Executive's employment is terminated.

       5.4   <u>Non-Solicitation</u>.  During Executive's service with the Company and its Affiliates and during the Restricted Period, Executive shall not, directly or indirectly, for Executive's own benefit or for the benefit of any third party, in any capacity (as a principal, shareholder, partner, director, officer, agent, consultant, contractor, employee, lender or otherwise):

       (a)   induce, solicit, recruit or attempt to persuade any Person to terminate such Person's employment or other relationship with the Company or any of its Affiliates or not to establish an employment or other relationship with the Company or any of its Affiliates to the extent such Affiliate is involved in the Restricted Business, whether or not such Person is or would be an employee, consultant, contractor, officer and/or director, whether or not such relationship is or would be pursuant to a written or oral agreement and whether or not such relationship is for a specific period of time or is at-will;

       (b)   employ or establish a business relationship with (or attempt to employ or establish a business relationship with), or encourage or assist any Person to employ or establish a business relationship with, any individual who was an employee, consultant, contractor, officer and/or director of the Company or any of its Affiliates (to the extent such Affiliate is engaged in the Restricted Business) during the previous 12 months; or,

(c)      (i) direct or engage in any act which may interfere with or adversely affect, alter or change the relationship (contractual or otherwise) of the Company or any of its Affiliates with any Person that is a customer, prospective customer, vendor, supplier or contractor of the Company or any of its Affiliates (in the case of an Affiliate, only to the extent that such Affiliate is engaged in the Restricted Business), or (ii) otherwise induce or attempt to induce any such Person to cease doing business, reduce or otherwise limit its business with the Company or any of its Affiliates.

5.5      Relief.

(a)      Executive acknowledges and agrees that (i) the covenants set forth in the Section 5 are reasonable and necessary in order to protect the legitimate interests of the Company and its Affiliates, and Executive is receiving adequate consideration hereunder; (ii) the Company will not have any adequate remedy at Law if Executive violates the terms hereof or fails to perform any of the obligations set forth in the Section 5; and (iii) the Company and its Affiliates shall have the right, in addition to any other rights it may have under applicable Law, to obtain from any court of competent jurisdiction preliminary and permanent injunctive relief to restrain any breach or threatened breach of, or otherwise to specifically enforce any such covenant or any of the other obligations set forth in the Section 5 (and Executive hereby waives any right to require any bond or security in connection therewith), as well as to obtain damages. All of these rights and remedies will be in addition to, and not in lieu of, any other rights and remedies available to the Company under Law or in equity.

(b)      If the period of time or scope of any restriction set forth in the Section 5 should be adjudged unreasonable in any proceeding, then the period of time shall be reduced by such number of months or the scope of the restriction shall be modified, or both, by a court of competent jurisdiction so that such restrictions may be enforceable for such time and in the manner to the fullest extent adjudged to be reasonable. If Executive violates any of the restrictions set forth in the Section 5, then the restrictive period shall not run in her favor from the time of the commencement of any such violation until such time as such violation shall be cured by him.

5.6      Returning Company Documents and Property.   Executive shall, upon termination of employment with the Company, for any reason, deliver to the Company, or its designee, and not keep in Executive's possession or deliver to anyone else, any and all records, data, notes, reports, information, proposals, lists, correspondence, emails, specifications, drawings, blueprints, sketches, materials, other documents, or reproductions or copies (including but not limited to on computer discs or drives) of any aforementioned items either developed by Executive pursuant to Executive's employment with the Company and its Affiliates or otherwise relating to the business of the Company and its Affiliates, retaining neither copies nor excerpts thereof.  Executive shall also, at such time, or earlier upon request, deliver to the Company, or its designee, all property of the Company and its Affiliates in Executive's possession, including cell phones, computers, computer discs, drives and other equipment or devices, and that if the Executive fails to do so the Company and its Affiliates may withhold from Executive's

compensation the replacement cost of property not returned to the fullest extent permitted by Law.

5.7     Non-disparagement.  Executive acknowledges and agrees that Executive shall not, whether in writing or orally, malign, denigrate or disparage the Company or any of its Affiliates or any of their respective predecessors or successors, or any of the current or former directors, officers, employees, shareholders, partners, members, agents or representatives of any of the foregoing, with respect to any of their respective past or present activities, or otherwise publish (whether in writing or orally) statements that tend to portray any of the aforementioned parties in an unfavorable light. Company acknowledges and agrees that it shall use its reasonable efforts to cause its members of the Board and its executive officers not, whether in writing or orally, to malign, denigrate or disparage Executive, or any of his or her Affiliates, or otherwise publish (whether in writing or orally) statements that tend to portray any of the aforementioned parties in an unfavorable light.

5.8     Disclosure of the Section 5.  The Company may disclose the existence and terms of the provisions of the Section 5 to any employer or other service recipient of Executive to or for which Executive may render services following the termination of Executive's providing services to the Company and its Affiliates. Unless otherwise agreed to by the Company in writing, Executive shall disclose the existence and terms of the provisions of the Section 5 to any employer or other service recipient of Executive to or for which Executive may render services following the termination of Executive's providing services to the Company and its Affiliates.

5.9     Acknowledgement.  Executive acknowledges and agrees that (a) Executive has had the opportunity to consult with independent counsel of Executive's own choosing concerning the provisions of the Section 5 and has been advised to do so by the Company, (b) Executive has read and understands the provisions of the Section 5, is fully aware of its legal effect, and has entered into it freely based on Executive's own judgment, (c) the duration and scope of the provisions of the Section 5 are reasonable and necessary to protect the customer relationships, trade secrets, proprietary information and other legitimate business interests of the Company and its Affiliates, (d) the Company and its Affiliates would not provide the consideration set forth in the Agreement to Executive unless Executive agrees to be bound by the provisions of the Section 5, and (e) Executive has not relied on any agreements or representations, express or implied, that are not set forth expressly in the Section 5.

**SECTION 6.     MISCELLANEOUS**

6.1     Prior Employment.  Executive represents and warrants that he or she is not a party to any other employment, non-competition, joint venture, partnership or other agreement or restriction that could interfere with his or her employment with the Company or his or her rights and obligations under the Agreement and that his or her acceptance of employment with the Company and the performance of her duties under the Agreement will not breach the provisions of any contract, agreement or understanding to which he or she is party or any duty owed by him or her to any person or entity.  Executive further represents and warrants that, while an employee of the Company, he or she will not hereafter become a party to or be bound by any such conflicting agreement.

6.2    <u>Section 409A Compliance</u>.

(a)    If Executive is a "specified employee" within the meaning of section 409A(a)(2)(B)(i) of the Internal Revenue Code of 1986, as amended (the "**Code**"), at the time of his or her termination of employment, any benefit payable under the Agreement that is considered "nonqualified deferred compensation" under Code Section 409A that is provided to Executive on account of his or her separation from service shall be paid no earlier than six months after his or her separation from service (or, if earlier, her death), and any amount that otherwise would have been paid during the six-month period will be paid in a lump sum on first business day of the seventh month following the month in which her separation from service occurs.

(b)    Any payments to be made under the Agreement upon a termination of the Executive's employment by the Company for Cause or without Cause, or as a result of the Executive's voluntary termination of employment, shall only be made if such termination of employment constitutes a "separation from service" under Code Section 409A.

(c)    Payments and benefits triggered by Executive's "separation from service" from the Company shall be made or initiated, as applicable, within 60 days following such separation from service.

(d)    If Executive experiences a "separation from service" from the Company and the 60-day period following such separation from service begins in one calendar year and ends in a second calendar year (a "**Crossover 60-Day Period**"), and if thee are any payments subject to Code Section 409A due Executive as a result of such separation from service that are:  (i) conditioned on Executive executing and not revoking a release of claims and (ii) otherwise due to be paid during the portion of the Crossover 60-Day Period that falls within the first year, then such payments will be delayed and paid in a lump sum during the portion of the Crossover 60-Day Period that falls within the second year; provided such release of claims becomes effective and irrevocable during the Crossover 60-Day Period, if at all.

(e)    For purposes of Section 409A, each installment payment provided under the Agreement shall be treated as a separate payment.

(f)    To the extent required by Code Section 409A, each reimbursement or in-kind benefit provided under the Agreement shall be provided in accordance with the following: (i) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during each calendar year cannot affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year; (ii) any reimbursement of an eligible expense shall be paid to Executive on or before the last day of the calendar year following the calendar year in which the expense was incurred; and (iii) any right to reimbursements or in-kind benefits under the Agreement shall not be subject to liquidation or exchange for another benefit.

(g)    The Agreement shall be interpreted to avoid any additional tax under Section 409A.  If any payment or benefit cannot be provided or made at the time specified herein without incurring sanctions under Section 409A, then such benefit or payment shall be provided in full at the earliest time thereafter when such sanctions will not be imposed.

6.3     Severability.  The invalidity or unenforceability of any particular provision or part of any provision of the Agreement shall not affect the other provisions or parts of the Agreement.  If any provision of the Agreement is determined to be invalid or unenforceable by a court of competent jurisdiction, by reason of the duration or geographical scope of the covenants contained in the Agreement, the duration or geographical scope, or both, shall be considered to be reduced to a duration or geographical scope to the extent necessary to cure the invalidity.

6.4     Assignment.  The Agreement shall not be assignable by Executive, but shall be assignable by the Company to any Affiliate and to any person or entity that may directly or indirectly become a successor in interest (by purchase of assets or stock or by merger, consolidation or otherwise) to the Company in the business or a portion of the business it presently operates; provided that notwithstanding the foregoing, the Company shall not assign the Agreement to any entity that does not operate exclusively in the Restricted Business without Executive's prior written consent. Subject to the foregoing, the Agreement and the rights and obligations set forth in the Agreement shall inure to the benefit of, and be binding upon, the parties and each of their respective permitted successors, assigns, heirs, executors and administrators.

6.5     Notices.  All notices and other communications given or made pursuant to the Agreement and any other documents incorporated herein by reference shall be in writing and shall be deemed effectively given:  (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next business day, (c) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent to the respective parties at their address as set forth on the signature page hereto, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with the Section 6.5.

6.6     Entire Agreement.   The Agreement, together with the Executive Compensation Plan, constitutes the entire agreement between the parties, and all promises, representations, covenants, understandings, warranties and agreements with reference to the subject matter hereof and inducements to the making of the Agreement relied upon by any party hereto, have been expressed in the Agreement or in the documents incorporated in the Agreement by reference. Any employment agreement, consulting agreement or other services arrangement between the Company and Executive existing prior to the Effective Date shall be amended, restated, replaced and superseded in its entirety by the Agreement.

6.7     Amendments and Waivers.   The Agreement, or any of its terms, covenants, agreements, conditions or provisions, may be amended or waived (either generally or in a particular instance and either retroactively or prospectively), upon the written consent of Executive and the Company; provided, however, that no waiver or consent on any one instance shall be deemed to be or be construed as a further or continuing waiver of any such term or condition unless it expressly so provides.  Neither the failure nor any delay on the part of any party to exercise any right, remedy, power or privilege shall operate as a waiver thereof.

6.8     <u>Governing Law</u>.    The Agreement and all aspects of Executive's employment by the Company shall be governed by and interpreted and enforced in accordance with the substantive laws of the State of Delaware (including, without limitation, provisions concerning limitations of actions), without reference to the conflicts of laws rules of that or any other jurisdiction, except that federal Law shall also apply to the extent relevant.

6.9     <u>Consent to Jurisdiction</u>.  Subject to the requirement to arbitrate set forth in <u>Section 6.11</u>, any legal suit, action or proceeding arising out of or based upon the Agreement or any other aspect of Executive's employment or the termination thereof, shall be instituted in the Federal Courts of the United States of America or the Courts of the State of Delaware in each case located in the City of Wilmington and the County of New Castle, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court unless and until such courts have refused to accept such jurisdiction. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

6.10    <u>Waiver of Jury Trial</u>.    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THE AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEEFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THE AGREEMENT.  EACH PARTY TO THE AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHE PARTY HAS REPRESENTED, EXPRESSLY OR OTHEWISE, THAT SUCH OTHE PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THE WAIVER, (C) SUCH PARTY MAKES THE WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THE AGREEMENT BY, AMONG OTHE THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THE SECTION.

6.11    <u>Arbitration</u>.  Except to enforce the restrictive covenants in <u>Section 5</u>, or in such other instances where either party seeks injunctive relief, any dispute, controversy or claim arising out of or related to the Agreement or the breach of the Agreement, or out of any other aspect of Executive's employment or separation therefrom, including but not limited to compensation, discrimination, and/or retaliation claims of any type, whether such claims arise by contract, statute, common law, equity, or otherwise, shall be submitted to and decided by binding arbitration in Wilmington, Delaware. Arbitration shall be administered exclusively by the American Arbitration Association and shall be conducted consistent with the rules, regulations and requirements thereof as well as any requirements imposed by state Law. Any arbitral award determination shall be final and binding upon the parties to the Agreement.

6.12    Headings; Counterparts.  The headings of paragraphs in the Agreement are for convenience only and shall not affect its interpretation.  The Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to constitute but one and the same Agreement.  The parties hereto may deliver the Agreement by facsimile signature, and each party shall be permitted to rely upon the signatures so transmitted to the same extent and effect as if they were original signatures.

6.13    Legal Fees for Enforcement of Agreement.  In any dispute, controversy or claim involving enforcement of the terms of the Agreement, including in any arbitration referred to in Section 6.11 above, the prevailing party shall be entitled to reimbursement of all reasonable legal, court and arbitration fees and expenses from the non-prevailing party.

6.14    Further Assurances.  Each of the parties shall execute such further instruments and take such other actions as the other party shall reasonably request in order to effectuate the purposes of the Agreement.

6.15    Survival.  No termination of employment under Section 4 shall relieve Executive of her obligations set forth under Sections 5 and 6 of the Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed the Agreement as of the date first written above.

COMPANY:

FLEXA TECHNOLOGIES, LLC

By _____

Name: ~~Kathleen Pierce-Gilmore~~   Daniel C. McCabe

Title: ~~Chief Executive Officer~~   General Counsel

EXECUTIVE:

_____

Address:

3903 Greenbank Lane
Newtown Square, PA 19073

Email address:

scottmandel@gmail.com

[Signature Page to Employment Agreement]