# **EXHIBIT B**

# BLANKROME

1201 N. Market Street | Suite 800 |Wilmington, DE 19801
blankrome.com

| | |
|---|---|
| *Phone:* | *(302) 425-6431* |
| *Fax:* | *(302) 428-5113* |
| *Email:* | *orlacchio@blankrome.com* |

July 19, 2019

RECEIVED
Voorhees, NJ

## *VIA FEDERAL EXPRESS*

JUL 2 2 2019

American Arbitration Association
Case Filing Services
1101 Laurel Oak Road, Suite 100
Voorhees, NJ 08043

American Arbitration Association

### RE:    *Flexa Network Inc. v. Scott Mandel*

Dear Sir or Madam:

Pursuant to the American Arbitration Association's ("AAA") Commercial Arbitration Rules, enclosed for filing are:

(1) Claimant Flexa Network Inc.'s ("Claimant") Demand for Arbitration;

(2) Addendum A to Claimant's Demand for Arbitration, which provides a brief description of the dispute and the relief sought, and attached thereto as Exhibit A is the employment agreement between Claimant and Respondent that provides for arbitration before the AAA (*see* paragraph 6.11 of Exhibit A for the arbitration clause) and Exhibit B, the advisor agreement between Claimant and Respondent;

(3) A check in the amount of $3,850.00 made payable the "American Arbitration Association" as payment of the Claimant's initial filing fee under the Flexible Fee Schedule.

Claimant and its counsel appreciate your attention to this matter. Please do not hesitate to contact me with any questions or concerns. Thank you.

Respectfully submitted,

Adam V. Orlacchio

AVO:
Enclosures

cc:    Scott Mandel (Respondent, service of original Demand via Federal Express);
Bradley S. Cohen, Esq. (Respondent's counsel, service of original Demand via Federal Express)



RECEIVED
Voorhees, NJ

JUL 2 2 2019

American Arbitration Association

AMERICAN ARBITRATION ASSOCIATION·

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION·

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

*For Consumer or Employment cases, please visit www.adr.org for appropriate forms.*

| You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement. |||
|---|---|---|
| Name of Respondent: Scott Mandel ||||
| Address: 3903 Greenbank Lane ||||
| City: Newtown Square | State: Pennsylvania | Zip Code: 19073 |
| Phone No.: 248-563-8105. | Fax No.: ||
| Email Address: scottmandel@gmail.com |||
| Name of Representative (if known): Bradley S. Cohen |||
| Name of Firm (if applicable): Earp Cohen P.C. |||
| Representative's Address: 20 Brace Road, Ste. 400 |||
| City: Cherry Hill | State: New Jersey | Zip Code: 08034 |
| Phone No.: 856-354-7700 | Fax No.: 856-354-0766 ||
| Email Address: bcohen@earpcohn.com |||

| The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration. |
|---|
| Brief Description of the Dispute:<br><br>Claimant seeks a declaratory judgment that it owes no additional salary or Flexacoin to Respondent, seeks damages for Respondent's breaches of the the June 1, 2018 Flexa Employment Agreement entered between the parties, and seeks damages for Respondent's breach of the duty of loyalty owed to Flexa. |
| Dollar Amount of Claim: $ Undetermined |
| Other Relief Sought: ☑ Attorneys Fees  ☑ Interest  ☑ Arbitration Costs  ☐ Punitive/Exemplary<br>☑ Other: declaratory relief |
| Amount enclosed: $ 3,850 |
| In accordance with Fee Schedule: ☑ Flexible Fee Schedule  ☐ Standard Fee Schedule |
| Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:<br><br>A former Delaware jurist. |
| Hearing locale: Wilmington, DE<br>*(check one)* ☐ Requested by Claimant  ☑ Locale provision included in the contract |

| Estimated time needed for hearings overall: | hours  or  4 | days |
|---|---|---|

*Please visit our website at www.adr.org if you would like to file this case online.*
*AAA Case Filing Services can be reached at 877-495-4185.*



AMERICAN
ARBITRATION
ASSOCIATION®  | INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

---

Type of Business:

Claimant: Cryptocurrency payment network    Respondent: Individual

Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other?
No

Signature (may be signed by a representative):    Date:
7/19/19

Name of Claimant: Flexa Network Inc.

Address (to be used in connection with this case): 79 Madison Avenue

City: New York    State: New York    Zip Code: 10016

Phone No.: (312) 925-3037    Fax No.:

Email Address: danny@flexa.co

Name of Representative: Adam Orlacchio

Name of Firm (if applicable): Blank Rome LLP

Representative's Address: 1201 North Market Street, Suite 800

City: Wilmington    State: Delaware    Zip Code: 19801

Phone No.: 302-425-6431    Fax No.: 302-425-6464

Email Address: Orlacchio@BlankRome.com

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ 08043. At the same time, send the original Demand to the Respondent.

---

**AMERICAN ARBITRATION ASSOCIATION**
**STATEMENT OF CLAIM**

RECEIVED
Voorhees, NJ

JUL 2 2 2019

American Arbitration Association

| | |
|---|---|
| **FLEXA NETWORK INC.,** | ) |
| | ) |
| | ) |
| **Claimant,** | )   **C.A. NO. _____** |
| | ) |
| **v.** | ) |
| | ) |
| **SCOTT MANDEL,** | ) |
| | ) |
| **Respondent.** | ) |
| | ) |

## STATEMENT OF CLAIM

Claimant, Flexa Network Inc. ("Flexa" or the "Company"), brings this action for declaratory relief, breach of contract, and breach of the duty of loyalty in connection with a June 1, 2018 employment agreement (the "Employment Agreement," attached hereto as **Exhibit A**) between Flexa and the Respondent, Mr. Scott Mandel ("Mandel"). Specifically, Flexa seeks a declaration that (1) the Employment Agreement superseded a previously executed May 19, 2018 advisor agreement between the parties (the "Advisor Agreement," attached hereto as **Exhibit B**; collectively, the Employment Agreement and the Advisor Agreement may be referred to herein as the "Agreements"); and, (2) Flexa owes no compensation to Mandel under the Agreements. In addition, Flexa seeks damages for Mandel's breaches of the Employment Agreement and Mandel's breaches of the duty of loyalty owed to Flexa. In support of its Statement of Claim, Flexa, by its undersigned counsel, avers as follows:

## PRELIMINARY STATEMENT

1.      In early 2018, Flexa built a payments network that enables users to spend their cryptocurrency at certain retail stores in the United States.

2.      A crucial component of Flexa's payments network was the creation of a digital token, or cryptocurrency, known as Flexacoin ("FXC"), which is utilized as collateral for every purchase made on Flexa's payment network.

3.      In early 2018, Flexa decided to offer FXC for sale to private buyers in order to disseminate FXC, endow FXC with value, and raise capital through an FXC token offering controlled by Regulation D of the Securities Act of 1933 (the "Private Offering").

4.      At or around this time, Mandel represented to Flexa that he could provide expert advice regarding the cryptocurrency industry and the token offering process, while also introducing Flexa to certain buyers from his extensive, personal network in the cryptocurrency community and/or working within Flexa's direct contacts or network, who, according to Mandel, would collectively pay Flexa approximately $50 million USD during the Private Offering.

5.      As a result, Flexa retained the services of Mandel.

6.      However, it quickly became apparent that Mandel lacked the requisite knowledge to provide reliable cryptocurrency market or token offering advice, and while Flexa gave Mandel multiple opportunities to succeed in introducing buyers to Flexa, Mandel's introductions resulted in only a small fraction of the $50 million threshold that he had set.

7.      Nevertheless, ignoring the terms and conditions of Agreements, Mandel repeatedly demanded that Flexa pay him an additional 1.4 billion units of FXC. In making his

2

demands, Mandel failed to cite to any provision in the Agreements that provided for such a payment.

8.  Accordingly, Flexa was forced to bring this action seeking a declaration that it owes no FXC or any other additional form of compensation to Mandel, and to recoup damages from Mandel as a result of his breaches loyalty and his breaches of the Employment Agreement, which include, but are not limited to, his: (a) failure to work full-time on behalf of Flexa; (b) participation in outside business ventures while employed by Flexa, including, but not limited to, some outside business ventures that had conflicting or detrimental interests to Flexa; (c) failure to provide reliable cryptocurrency market and/or token offering advice to Flexa; (d) failure to introduce Flexa to a sufficient number of FXC buyers; (e) interference with prospective FXC buyers; (f) insubordination while employed with Flexa, including, but not limited to, his refusal to take direction from or cooperate with Flexa; and, (g) upon information and belief, intentional exposure of Flexa to possible violations of federal securities laws (hereinafter, the "Mandel Breaches").

## PARTIES

9.  Flexa is a Delaware corporation with its principal place of business at 79 Madison Avenue, New York, NY 10016.

10.  Mandel is an individual residing, on information and belief, in or around Philadelphia, Pennsylvania.

## JURISDICTION

11.  The American Arbitration Association ("AAA") has jurisdiction over this dispute pursuant to § 6.11 of the Employment Agreement, which states:

> Arbitration: Except to enforce the restrictive covenants in Section
> 5, or in such other instances where either party seeks injunctive

3

relief, any dispute, controversy or claim arising out of or related to the Agreement or the breach of the Agreement, or out of any other aspect of Executive's employment or separation therefrom, including but not limited to compensation, discrimination, and/or retaliation claims of any type, whether such claims arise by contract, statute, common law, equity, or otherwise, shall be submitted to and decided by binding arbitration in Wilmington, Delaware. Arbitration shall be administered exclusively by the American Arbitration Association and shall be conducted consistent with the rules, regulations and requirements thereof as well as any requirements imposed by state Law. Any arbitral award determination shall be final and binding upon the parties to the Agreement.

12.     The parties' dispute is governed by the law of the State of Delaware. *See* Employment Agreement, § 6.8.

## FACTUAL BACKGROUND

### A. The Parties Enter Into The Advisor Agreement

13.     In early 2018, Flexa began discussions with Mandel regarding the possibility of him providing Flexa with cryptocurrency market and token offering advice, while assisting with buyer introductions from his personal network and/or helping develop buyers from Flexa's existing network, during the Private Offering. At this time, Mandel represented to Flexa that his efforts in this context would result in approximately $50 million USD being paid to Flexa for FXC.

14.     On May 19, 2018, in reliance on Mandel's representations, Flexa entered into the Advisor Agreement with Mandel. The initial term of the Advisor Agreement was three months. *See* Advisor Agreement § 3.

15.     Mandel did not receive a salary under the Advisor Agreement. Instead, Mandel was to be compensated in FXC based on his buyer introductions for Flexa. Specifically, if Mandel introduced buyers to Flexa who spent at least 56,667 Ethereum (a cryptocurrency known as "ETH"), Mandel would earn an "Initial FXC Payment" equivalent to $2,000,000. *See* Advisor

4

Agreement § 4.1. If Mandel's introductions resulted in 85,000 ETH paid to Flexa, he would receive an additional "Bonus ETH Payment" equivalent to $2,000,000 in FXC. *Id.*

### B. Conversion of Advisor Agreement to Employment Agreement

16.     By the summer of 2018, it was clear to Flexa that Mandel could not provide reliable cryptocurrency market or token offering advice, and that his buyer introductory efforts had failed; indeed, Mandel's buyer introductions amounted to less than 10% of the 56,667 ETH threshold that he agreed to and accepted in the Advisor Agreement.

17.     Nevertheless, Flexa still wanted to work with Mandel, and ensure that he was compensated in some way for the services he had provided. Further, consistent with Flexa's efforts towards strict regulatory compliance, it had determined that hiring Mandel as a full-time employee and terminating the Adviser Agreement was potentially more appropriate from a regulatory standpoint to comply with the federal securities laws. For each of these reasons, Flexa offered Mandel an employment position.

18.     Flexa and Mandel agreed to terminate the Advisor Agreement, and replace it with the Employment Agreement, which was executed by the parties after it was reviewed and modified by Mandel's own attorneys.

19.     The Employment Agreement required (in relevant part) that Mandel: (a) be a full-time employee for Flexa; (b) cease working for any other business(es) while employed by Flexa; and; (c) continue to introduce buyers to Flexa from his personal network. For these employment services, Mandel agreed to accept a $100,000 USD fixed, annual salary, with the possibility of a one-time "Initial Coin Offering Bonus" of 2,857,142,860 FXC (the "FXC Token Bonus") within the sole discretion of Flexa's board of directors (the "Board"). *See* Employment Agreement §§ 1.2, 3.1, 3.2.

5

20. Notably, Mandel and his personal attorneys reviewed and modified Employment

Agreement § 3.2, specifically.

21. Under § 1.2 of the Employment Agreement, Mandel's duties included:

> Capacities and Duties: (a) Executive shall serve as Director of Community of the Company and of such Affiliates of the Company as are designated by the Board. Executive shall have such duties and authorities consistent with such position.
>
> (b) Executive (i) shall devote his or her full working time, energy, skill, and best efforts to the performance of his or her duties set forth in the Agreement, in a manner that will faithfully and diligently further the business and interests of the Company and its Affiliates, and (ii) shall not be employed by or participate or engage in or in any manner be a part of the management or operation of any other business enterprise unless disclosed on the Authorized Outside Business Activities list that is attached hereto as Addendum A, or that is separately authorized in writing by the Board at a later date, which authorization shall become Addendum B to this Agreement.

22. Pursuant to §§ 4.3 and 4.4 of the Employment Agreement, Mandel could be

terminated with or without cause. Termination for "cause" under § 4.3 included:

   a. "participating in a criminal act or fraud in performance of his... duties for the company";

   b. "violation of a material duty or obligation under the Agreement, of any material Company policy, or of any express direction of any rule or regulation reasonably established by the Board"; and

   c. "gross misconduct in the performance of, or neglect of," Mandel's duties.

23. Pursuant to §§ 4.5 and 4.6, Mandel could terminate the Employment Agreement

for "good reason" (*i.e.*, reduction in salary) or "without good reason."

24. Furthermore, § 6.6 of the Employment Agreement provided (and Mandel agreed

to and accepted) that the Advisor Agreement would no longer have any force or effect

whatsoever:

6

> "Entire Agreement. . . . Any employment agreement, consulting agreement or other services arrangement between the Company and [Mandel] existing prior to the Effective Date shall be amended, restated, replaced and superseded in its entirety by the Agreement."

*See* Employment Agreement § 6.6.

## C. Mandel Breaches the Employment Agreement and Demands the FXC Token Bonus

25.     By the fall of 2018, Flexa confirmed that Mandel's efforts as an employee under the Employment Agreement were no better than the services he was providing under the Advisor Agreement. Put simply, Mandel was underperforming, and he was not devoting his full-time efforts to Flexa; indeed, Mandel ultimately admitted that he was only working part-time for Flexa from home while pursuing other business opportunities.

26.     Moreover, while Mandel was purportedly working for Flexa, he was insubordinate by refusing to take direction from the Company regarding buyer introductions and/or communications. For example, instead of contacting his alleged large network of interested buyers, Mandel spoke with just a few of his close friends who had already agreed to purchase FXC. He also failed or refused to disclose his contacts to Flexa, thereby preventing Flexa from conducting its own outreach to certain potential FXC buyers.

27.     Flexa, therefore, determined that the parties' then relationship under the Employment Agreement was unsustainable; however, in lieu of terminating Mandel (who by this point was a personal friend of one or more Flexa employees), Flexa instead suggested to Mandel that he resign as an employee and return to his part-time advisory role. Towards this end, Flexa offered Mandel a new advisor agreement, which would pay him 1.4 billion FXC (the "October 2018 Adviser Agreement").

28.     Mandel refused to accept the October 2018 Advisory Agreement and, instead, insisted that he remain a Flexa employee pursuant to the Employment Agreement. Mandel

7

informed Flexa that his attorneys had advised him that he should remain a Flexa employee in order to be personally protected from security law regulations, and that his personal security, as well as that of his family, was more important to him that any amount of FXC, thus the Employment Agreement was necessary for him.

29.     Flexa agreed to Mandel's request, and informed him that the Employment Agreement could remain in place, provided he recommit to devoting all of his time to Flexa, refrain from engaging in other business interests and opportunities, and take direction from management of Flexa in performing his job functions.

30.     Flexa also reminded Mandel that the Employment Agreement did not include a guaranteed FXC payment for him and, to the contrary, he would instead only be eligible for a future FXC bonus payment if approved by Flexa's Board at a later date. *See* Employment Agreement, § 3.1 and 3.2. Mandel agreed to and accepted this, again citing his desire for personal and familial security over any FXC payments (a sentiment he re-stated on more than one occasion, and to more than one Flexa co-founders, who he thanked for the opportunity).

31.     Thereafter, notwithstanding Mandel's purported recommitment to work for Flexa under the Employment Agreement, Mandel's material breaches continued. He never worked full-time for Flexa; he did not fully perform his duties under the Employment Agreement; and, upon information and belief, he intentionally subjected Flexa to possible securities law violations.

32.     Also, the total amount paid by buyers that Mandel introduced to Flexa during the Private Offering was $1,092,549.96 USD, an amount far less than the $50 million USD threshold he had initially set, or the $40 million USD threshold he agreed to and accepted in the Advisor Agreement that was superseded by the Employment Agreement.

33.     In or about the fall of 2018 (and, not surprisingly, at a time when the value of

8

FXC had climbed), Mandel approached Flexa and asked when he would be paid his FXC Token Bonus as per the Employment Agreement § 3.2. Flexa reminded Mandel that pursuant to the Employment Agreement § 3.2, there was no guarantee he would receive any FXC Token Bonus, and that while he remained eligible for the FXC Token Bonus, it could only be awarded by an affirmative Board vote.

34.      Dissatisfied with the lack of certainty regarding the timing and amount of his FXC Token Bonus, Mandel offered to resign as a Flexa employee, and execute the October 2018 Advisor Agreement that had been previously offered by Flexa (but rejected by Mandel), pursuant to which Mandel would have received 1.4 billion FXC. This took Flexa by surprise since Mandel had rejected the October 2018 Advisor Agreement based on the advice of his own attorneys, and as a result of his purported need to protect the security of him and his family. In any case, Flexa denied Mandel's request to somehow revert back to the October 2018 Advisor Agreement that he had rejected.

35.      Mandel's repeated requests for an FXC Token Bonus pushed the Board to formally address the issue, and on October 26, 2018, Flexa provided Mandel with written notice that the Board had voted to pay him no FXC Token Bonus. The Board's decision, in part, was due to its uncertainly in how to withhold the proper amount of income taxes for cryptocurrency payments, and whether a payment in cryptocurrency to an employee was permissible under controlling securities laws. Mandel, however, refused to accept the Board's decision, and continued to assert that he should be paid a bonus of at least 1.4 billion FXC, notwithstanding the actual terms and conditions of the controlling Employment Agreement § 3.2, which his own attorneys had reviewed and modified.

36.      In an attempt to amicably resolve this issue, Flexa proposed meeting with Mandel

9

to discuss a potential new compensation arrangement that might include FXC tokens, provided Mandel agreed to new terms and conditions regarding the services he would be providing. Mandel, however, refused to meet with Flexa – *his employer* – and instead retained an attorney who directed Flexa to cease communicating with Mandel, *Flexa's employee.*

37.     On October 29, 2018, Mandel provided written notice to Flexa that he would perform no further services on its behalf. Flexa accepted Mandel's voluntary termination of employment on that date.

38.     As a result of Mandel's voluntary termination of his own employment, Flexa repeated its prior request that he provide certain information (e.g., an executed W-4, and an employment eligibility form) in order that Flexa could process payment of his full salary pursuant to the Employment Agreement.

39.     Mandel failed or refused to provide this information, even when directed to do so by his own attorneys.

40.     As a result, Flexa was forced to retain legal counsel to determine how to process a salary payment for an employee that refused to provide a W-4, and/or other required payment processing information.

41.     At or around this time, Mandel contacted Flexa to make yet another offer. This time, Mandel advised that if Flexa pay him 1.4 billion FXC, he would raise $1 million USD from an interested new buyer. Flexa reminded Mandel that there was no current agreement in place for any such business arrangement between him and Flexa, and that even if such an agreement did exist and protections for such a deal were in place, his proposed payment arrangement made no financial sense for Flexa, regardless. Indeed, this was communicated to Mandel's counsel as well.

10

42. On or about May 22, 2019, Flexa paid Mandel all of the salary owed to him under the Employee Agreement, which totaled $41,153.85 (gross), or $29,258.07 (net) for his employment period of June 1, 2018 through October 28, 2018.

43. However, Mandel's breach of the duty of loyalty he owed to Flexa now requires that the $29,258.07 net salary paid to him by Flexa be disgorged and returned to Flexa, and that he pay Flexa additional damages in an amount to be proven at the arbitration hearing in this matter for the Mandel Breaches.

44. It must be emphasized that Mandel has potentially exposed Flexa to liability under the federal securities laws. Upon information and belief, Mandel told certain buyers that they could freely trade their FXC tokens immediately after the issuance and receipt of the FXC tokens, even though Mandel had been advised by Flexa that the FXC tokens were sold as "restricted securities" subject to transfer restrictions (the "Restricted Legend"), requiring the buyer(s) to hold (and not trade) the tokens for one year pursuant to the federal securities laws. Flexa's damages relating to Mandel's misconduct in this context remain ongoing.

45. Finally, Mandel recently attempted to extort Flexa by demanding that it pay him 1.4 billion FXC or he will disclose alleged confidential information of Flexa and thereby, according to Mandel, "take down" Flexa. Given Mandel's extortion attempt, and for each of the foregoing reasons, Flexa was forced to bring this action against Mandel.

## COUNT I
### (Declaratory Judgment)

46. Flexa hereby incorporates by reference all preceding paragraphs of this Statement of Claim as though the same were fully set forth herein.

47. An actual controversy exists between Flexa and Mandel as to whether Flexa owes Mandel compensation under the Agreements.

11

48.     Flexa requests the Arbitrator declare that (a) the Employment Agreement superseded and replaced the Advisor Agreement; (b) Flexa does not owe any amount of compensation, including, but not limited to, FXC; and (c) Flexa has provided all compensation it owes to Mandel, including but not limited to any compensation under the Agreements.

## COUNT II
### (Breach of Contract)

49.     Flexa hereby incorporates by reference all preceding paragraphs of this Statement of Claim as though the same were fully set forth herein.

50.     Pursuant to § 1.2(b) of the Employment Agreement, Mandel agreed to "devote his or her full working time, energy, skill, and best efforts to the performance of his or her duties."

51.     Pursuant to § 1.2(b) of the Employment Agreement, Mandel agreed to perform his duties "in a manner that will faithfully and diligently further the business and interests of the Company and its Affiliates."

52.     Pursuant to § 1.2(b) of the Employment Agreement, Mandel agreed to "not be employed by or participate or engage in or in any manner be a party of the management or operation of any other business enterprise" unless authorized in writing by Flexa's Board.

53.     Mandel has breached § 1.2(b) of the Employment Agreement by and through the Mandel Breaches, which include but are not limited to:

      a) Failing to work full time on behalf of Flexa;

      b) Performing outside business activities while employed by Flexa, including, but not limited to some outside business ventures that had conflicting or detrimental interests to Flexa;

      c) Failing to provide reliable cryptocurrency market or token offering advice to Flexa;

12

d) Failing to diligently make buyer introductions during the Private Offering;

e) Interfering with prospective FXC buyers during the Private Offering;

f) Insubordination while employed by Flexa; and,

g) Upon information and belief, representing to certain buyers during the Private Offering that they could ignore the Restricted Legend for the FXC tokens in violation of federal law.

54.    Flexa has complied in all material respects with its obligations under the Employment Agreement.

55.    As a direct and proximate result of the Mandel Breaches, Flexa has incurred significant damages in an amount to be proven at the arbitration hearing in this matter, including, but not limited to, damages resulting from: (a) the time and money spent attempting to reach revised employment and advisor agreements with Mandel; (b) re-engineering software that was used to onboard buyers of FXC, which was never used for Mandel's intended purpose; (c) upon information and belief, Mandel's instruction(s) to certain buyers that they could ignore the Restricted Legend for the FXC tokens in violation of law; (d) repairing the reputational harm Mandel inflicted through his actions on behalf Flexa; and, (e) the $29,258.07 salary payment made to Mandel, which was unjustly obtained by Mandel at the expense of Flexa, and which should now be disgorged from Mandel and returned to Flexa.

## COUNT III
## (Breach of the Duty of Loyalty)

56.    Flexa hereby incorporates by reference all preceding paragraphs of this Statement of Claim as though the same were fully set forth herein.

57.    Mandel, as an employee of Flexa, owed the undivided duty of loyalty to his employer, Flexa.

13

58.     Mandel breached his duty of loyalty to Flexa (i) by working on other business ventures while employed by Flexa, including, but not limited to, some outside business ventures that had conflicting or detrimental interests to Flexa; (ii) by refusing to disclose contact information of potential buyers and/or advisors, such that Flexa was prohibited from attempting its own outreach to those contacts to raise necessary capital to support the business of the Company; and, (iii) upon information and belief, representing to certain buyers during the Private Offering that they could ignore the Restricted Legend for the FXC tokens in violation of federal law.

59.     In addition to compensating Flexa for the damages incurred From Mandel's loyalty, including, but not limited to, Flexa's potential exposure to liability under the federal securities laws, Mandel should be required to disgorge any and all gains, including, but not limited to, compensation unjustly obtained at the expense of Flexa resulting from his breach of loyalty and any profits derived from Mandel's outside business activities.

60.     As a result of Mandel's breach of loyalty, Flexa has been and continues to be damaged.

## PRAYER FOR RELIEF

WHEREFORE, Claimant respectfully requests that the Arbitrator assigned to this matter, after hearing, enter judgment in its favor, against Respondent, and award Claimant the following relief:

1. Adjudicate and declare that the Employment Agreement superseded and replaced the Advisor Agreement;

2. Adjudicate and declare that Claimant owes no amount of FXC to Respondent under the Employment Agreement or the Advisor Agreement;

14

3. Adjudicate and declare that Claimant has provided all compensation it owes to Respondent under the Employment Agreement and the Advisor Agreement;

4. Assess and award Claimant damages resulting from the Mandel Breaches of the Employment Agreement;

5. Assess and award Claimant damages resulting from Respondent's breaches of his duty of loyalty;

6. Order Respondent to disgorge any and all gains received as a result of his breach of contract and/or his duty of loyalty;

7. Award Claimant pre-judgment and post-judgment interest and costs incurred in this action, including its reasonable attorney's fees and all arbitration related costs, fees, and expenses; and,

8. Such other relief as this the Arbitrator deems just and equitable under the circumstances.

**BLANK ROME LLP**

Adam V. Orlacchio (#5520)
1201 North Market Street, Suite 800
Wilmington, DE 19801
Tel:    (302) 425-6400
Fax:    (302) 425-6464
E-mail: Orlacchio@BlankRome.com

*Attorneys for Claimant Flexa Network Inc.*

Date: July 19, 2019

15

# EXHIBIT A

## FLEXA EMPLOYMENT AGREEMENT

This FLEXA EMPLOYMENT AGREEMENT (the "**Agreement**") is dated this June 1, 2018 (the "**Effective Date**"), and is between Flexa Technologies LLC, a Delaware limited liability company (the "**Company**") and Scott Mandel ("**Executive**").

NOW THEEFORE, in consideration of the premises and the mutual covenants and agreements contained in the Agreement and intending to be legally bound, the parties hereto agree as follows:

### SECTION 1.    CAPACITY AND DUTIES

1.1    Employment; Acceptance of Employment. The Company hereby employs Executive, and Executive hereby accepts employment by the Company, for the period and upon the terms and conditions set forth in the Agreement.

1.2    Capacity and Duties.

(a)    Executive shall serve as Director of Community of the Company and of such Affiliates of the Company as are designated by the Board. Executive shall have such duties and authorities consistent with such position.

(b)    Executive (i) shall devote his or her full working time, energy, skill, and best efforts to the performance of his or her duties set forth in the Agreement, in a manner that will faithfully and diligently further the business and interests of the Company and its Affiliates, and (ii) shall not be employed by or participate or engage in or in any manner be a part of the management or operation of any other business enterprise unless disclosed on the Authorized Outside Business Activities list that is attached hereto as Addendum A, or that is separately authorized in writing by the Board at a later date, which authorization shall become Addendum B to this Agreement.

### SECTION 2.    TERM OF EMPLOYMENT

2.1    Term. The initial term of Executive's employment under the Agreement shall be one (1) year commencing on the Effective Date (the "**Initial Term**") and thereafter shall automatically be renewed from year to year, unless and until either party shall give notice of their election to terminate Executive's employment at least 30 days prior to the end of the then current term (the Initial Term together with any renewal term, the "**Term**"; the Term shall be deemed for all purposes to have terminated on the date that Executive's employment with the Company terminates). If notice of termination is given in accordance with the Section 2.1, the Company shall not thereafter be obligated to make any further payments or provide any benefits to Executive pursuant to the Agreement other than (i) any salary, bonus and expense reimbursement that has been fully earned by, but not yet paid to, Executive under the Agreement as of the date of such termination, which amounts will be paid on the next regularly scheduled payment date for such items, and (ii) as otherwise required by applicable Law. Nothing in the

Section 2.1 shall limit any party's right to terminate Executive's employment in accordance with Section 4.

2.2 Key-Man Insurance. Executive agrees to submit to such physical examinations, tests and interviews as may be reasonably requested by the Company (at Company expense) for purposes of obtaining key-man insurance covering the Executive.

## SECTION 3. COMPENSATION

3.1 Base Compensation. As compensation for Executive's services under the Agreement during the Term, the Executive shall be paid $100,000 U.S. Dollars, which shall be paid in periodic installments in accordance with the Company's regular payroll practices in effect.

3.2 ICO Bonus. Executive shall be eligible to receive a one-time Initial Coin Offering Bonus of 2,857,142,860 Flexacoins ("FXC") within thirty (30) days of the close of the Company's Initial Coin Offering and following Board approval. In the event any Board member(s) are added to the Company's Board after the date of this Agreement that could prohibit approval of this ICO Bonus, then the Company agrees that said ICO Bonus shall be due and owing to Executive in accordance with the terms and conditions of this Agreement.

3.3 Employee Benefits. Executive shall be eligible to participate in all of the Company's benefit programs, in accordance with the terms of such programs as in effect from time to time, that is offered to all of the Company's executive employees with comparable levels of responsibility and compensation from time to time. These benefits shall include, but not be limited to, health insurance, life insurance, disability insurance, and participation in the Company's profit-sharing, 401(k), or any other retirement savings plan.

3.4 Vacation. Executive shall be entitled to a paid vacation in accordance with Company policy during the Term of his or her employment, which shall in no case be less than twenty (20) days of paid vacation per year. Earned but unused vacation days will not be eligible to be carried over to the next calendar year and such unused days shall be forfeited by Executive at the end of the calendar year and upon separation from the Company for any reason, unless otherwise prohibited by applicable Law.

3.5 Expense Reimbursement. During the Term, the Company shall reimburse Executive for all reasonable expenses he or she incurs in connection with the performance of his or her duties in accordance with the Company's regular reimbursement policies as in effect from time to time and upon receipt of itemized vouchers and such other supporting information as required by the Company's policies.

## SECTION 4. TERMINATION OF EMPLOYMENT

4.1 Death of Executive. Upon Executive's death, Executive's employment with the Company shall terminate immediately. The Company shall not thereafter be obligated to make any further payments or provide any benefits to Executive other than (i) any salary, bonus

2

and expense reimbursement that has been fully earned by, but not yet paid to, Executive under the Agreement as of the date of such termination, which amounts will be paid on the next regularly scheduled payment date for such items, and (ii) as otherwise required by applicable Law.

4.2    Disability of Executive. If Executive becomes Disabled during the Term, then Executive's employment with the Company shall terminate immediately upon notice to Executive, in which event, the Company shall not thereafter be obligated to make any further payments or provide any benefits to Executive other than (i) any salary, bonus and expense reimbursement that has been fully earned by, but not yet paid to, Executive under the Agreement as of the date of such termination, which amounts will be paid on the next regularly scheduled payment date for such items, (ii) benefits under any policies of disability insurance, if any, and (iii) as otherwise required by applicable Law. "**Disabled**" means either (x) the definition of disability set forth in any disability insurance policy under which Executive is the insured held by the Company at the time of the termination pursuant to the Section 4.2, or (y) if no such policy is in effect at such time, Executive, in the reasonable opinion of the Managers and subject to applicable Law, is, or has been unable, due to a physical, mental or emotional illness or condition of Executive, to materially perform his or her duties under the Agreement for a period of 90 consecutive days or 120 days during any period of 180 consecutive days.

4.3    Termination for Cause. If the Company delivers a notice to Executive that the Company is terminating Executive's employment for Cause, which notice shall set forth in reasonable detail the Company's reasons therefor, then Executive's employment with the Company shall terminate immediately. However, if such termination is pursuant to Section 4.3(d) or (e) and Executive shall have never received a prior termination notice with respect to Section 4.3(d) or (e), Executive's employment with the Company shall terminate upon the 30th day following delivery of such notice if Executive has not cured the Cause set forth in the notice within such 30 day period. Upon any such termination, the Company shall not be obligated to make any further payments to Executive other than (i) salary and expense reimbursement that have been fully earned by, but not yet paid to, Executive under the Agreement as of the date of such termination, which amounts will be paid on the next regularly scheduled payment date for such items, and (ii) as otherwise required by applicable Law. As used in the Agreement, "**Cause**" shall mean the following:

(a)    participating in a criminal act or fraud in performance of his or her duties for the Company, and/or theft, misappropriation and/or embezzlement of funds from the Company or its Affiliates, in each case, that the Board in good faith believes to have occurred;

(b)    engaging in any act of discrimination, retaliation or sexual or other unlawful harassment that the Board in good faith believes to have occurred;

(c)    Executive's conviction or plea of no contest with respect to any felony;

3

(d)     violation of any material duty or obligation under the Agreement, of any material Company policy, or of any express direction or any rule or regulation reasonably established by the Board;

(e)     gross misconduct in the performance of, or neglect of, Executive's duties; or

(f)     the unlawful use (including being under the influence) or possession of illegal drugs by the Executive on the premises of the Company or any of the Company's Affiliates while performing any duties or responsibilities with the Company or any of the Company's Affiliates.

4.4     Termination Without Cause.     The Board may terminate Executive's employment with the Company without Cause upon 30 days' prior written notice of the date of such termination. The Company shall not thereafter be obligated to make any further payments or provide any benefits to Executive other than (i) any salary, bonus and expense reimbursement that have been fully earned by, but not yet paid to, Executive under the Agreement as of the date of such termination, which amounts will be paid on the next regularly scheduled payment date for such items, and (ii) as otherwise required by applicable Law. In addition, in exchange for Executive executing a separation agreement (in the form provided by the Company to Executive within 7 days of the date such notice is given to Executive and containing a release of claims in favor of the Company and its Affiliates (the "**Release**")) within the applicable period under the federal Age Discrimination in Employment Act (currently, either 21 or 45 calendar days) and not subsequently revoking the Release, and complying with the terms of the Agreement, including but not limited to the provisions in Section 5, the Company shall pay Executive an amount equal to six (6) months of the Base Salary at the annual rate being paid at the date of termination of employment under Section 3.1, in periodic installments in accordance with the Company's regular payroll practices in effect from time to time ("**Severance Pay**"). Subject to Section 6.2, the payments of Severance Pay under the Section shall commence on the first regular pay day immediately following the end of the seven-day Release revocation period in respect of the Release. Upon making the required payments in accordance with the Section 4.4, the Company shall have no further obligation to Executive.

4.5     Termination By Executive for Good Reason.     Executive may terminate his or her employment with the Company on written notice to the Company for "**Good Reason.**" Good Reason means: (a) a material diminution in Executive's duties as an employee of the Company and its Affiliates; (b) any change in Executive's duties that requires Executive to relocate from Executive's primary office in New York, NY, to a location other than the location of Executive's primary office as of the Effective Date; or (c) a reduction by the Company of the base salary paid to Executive. The Company shall not thereafter be obligated to make any further payments or provide any benefits to Executive other than (i) any salary, bonus and expense reimbursement that have been fully earned by, but not yet paid to, Executive under the Agreement as of the date of such termination, which amounts will be paid on the next regularly scheduled payment date for such items, and (ii) as otherwise required by applicable Law. In addition, in exchange for Executive executing the Release within the applicable period under the federal Age Discrimination in Employment Act (currently, either 21 or 45 calendar days) and not

4

subsequently revoking the Release, and complying with the terms of the Agreement, including but not limited to the provisions in Section 5, the Company shall pay Executive Severance Pay. Subject to Section 6.2, the payments of Severance Pay under the Section shall commence on the first regular pay day immediately following the end of the seven-day Release revocation period in respect of the Release. Upon making the required payments in accordance with the Section 4.5, the Company shall have no further obligation to Executive.

                4.6     Termination by Executive Without Good Reason.  The Agreement and Executive's employment with the Company will terminate automatically upon the voluntary termination of the employment of Executive. Upon such termination, Executive will only be entitled to receipt of (i) any salary, bonus and expense reimbursement that have been fully earned by, but not yet paid to, Executive under the Agreement as of the date of such termination, which amounts will be paid on the next regularly scheduled payment date for such items, and (ii) as otherwise required by applicable Law.

## SECTION 5.    RESTRICTIVE COVENANTS

                5.1     Confidentiality.

                (a)     Executive shall not, either during or after her employment with the Company and its Affiliates, directly or indirectly, use, publish, or otherwise disclose or divulge to any third party any Confidential Information other than as required by Law or as required to perform Executive's duties under the Agreement during the Term. For purposes of the Agreement, **"Confidential Information"** includes any trade secrets or confidential or proprietary information of the Company or any of its Affiliates (in any medium) including, without limitation, any such information concerning customers, vendors, services, products, processes, pricing policies, business plans, records, invoices, customer correspondence, orders, computer records or software, technical or financial information or data, mailing or telephone or customer lists or any information relating to the sales or customer history or business prospects of the Company or any of its Affiliates and further includes, without limitation, all unpublished information and all information and data, inventions or systems that are not generally known by the industry in which the Company and its Affiliates operate, but excludes information that (i) is generally available to and known within the industry of the Restricted Business through no fault of Executive or (ii) is lawfully acquired or developed by Executive after the termination of her employment with the Company and its Affiliates from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. Moreover, if Executive is compelled to disclose any Confidential Information by judicial or administrative process or by othe requirements of Law, Executive shall promptly notify the Company in writing and shall disclose only that portion of such Confidential Information which Executive is compelled to disclose, at the advice of Executive's counsel; provided that (A) to the extent possible, the Company is first given notice of the required disclosure and an adequate opportunity to seek appropriate legal relief to prevent such disclosure or limit use and further disclosure of the information required to be disclosed, and (B) Executive provides such cooperation as the Company shall reasonably request.

                (b)     Executive shall not, either during or after the Term, directly or indirectly, copy, reproduce or remove from the Company's or any of its Affiliates' premises,

except as required to perform Executive's duties under the Agreement during the Term, any Confidential Information. In addition, all documents, files and records, and all other memoranda, notes, files, lists and other documents made, compiled or otherwise acquired by Executive in the course of her employment with the Company and any of its Affiliates are and shall remain the sole property of the Company and/or its Affiliates (whether deemed Confidential Information or not) and all originals and copies thereof shall be delivered to the Company upon termination of Executive's employment for whatever reason or at such earlier time as the Company may request.

(c)     Executive recognizes that the Company and its Affiliates have received and in the future will receive from third parties (including customers of the Company) their confidential or proprietary information subject to a duty on the part of the Company and its Affiliates to maintain the confidentiality of such information and to use it only for certain limited purposes. Executive shall hold all such confidential or proprietary information in the strictest confidence and shall not disclose it to any Person or to use it except as provided above or as necessary in carrying out Executive's work for the Company and its Affiliates consistent with the Company's or its Affiliates' agreement with such third party.

5.2     Inventions and Improvements. During the Term, Executive shall promptly communicate to the Company all ideas, knowledge, discoveries, inventions and improvements related exclusively to the Restricted Business (collectively, "**Inventions and Improvements**") that are or may be useful to the Company or Affiliates in their business. Executive acknowledges that Inventions and Improvements that are made, conceived or reduced to practice by him or her that relate to the Company's or its Affiliates' business and every item of non-public knowledge relating to the Company's or its Affiliates' business gained by him or her during his or her employment are the property of the Company or its Affiliates (including but not limited to such Inventions and Improvements made, developed or otherwise conceived by Executive that are related to the Company's business prior to the Effective Date), and Executive irrevocably assigns all such Inventions and Improvements to the Company for its sole use and benefit, without additional compensation. The provisions of the Section 5.2 shall apply whether such Inventions and Improvements are conceived, made or gained by him or her alone or with others, whether during or after usual working hours, whether on or off the job, and whether or not within the specific realm of his or her duties. It shall be rebuttably presumed that Inventions and Improvements relating to the Company's or its Affiliates' business conceived during the 6 months following termination of Executive's employment are, for the purposes of the Agreement, conceived before the termination of his or her employment. Executive shall, upon request of the Company, at any time during or after the Term, sign all instruments and documents requested by the Company and otherwise cooperate with the Company to protect its right to such Inventions and Improvements, including applying for, obtaining and enforcing patents and copyrights thereon in any and all countries. Notwithstanding any contrary implication of the foregoing, no provision in the Agreement requires Executive to assign any of his or her rights to any Inventions and Improvements for which no equipment, supplies, facility or trade secret information of the Company or its Affiliates was used and which was developed entirely on Executive's own time, unless the Invention and Improvement relates to the Restricted Business.

5.3     Non-Competition. During Executive's employment with the Company and for one (1) year thereafter, regardless of the reason for his or her separation and whether

6

caused by the Company or Executive (the **"Restricted Period"**), Executive shall not, and shall not permit any of her Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in the Restricted Business in the Territory; (ii) have an interest in any Person (other than a direct or indirect interest in the Company or its Affiliates) that engages directly or indirectly in the Restricted Business in the Territory in any capacity, including as a partner, shareholder, member, lender, employee, principal, agent, trustee or consultant; or (iii) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the Effective Date) between the Company or its Affiliates and any customers or suppliers of the Company or its Affiliates. Notwithstanding the foregoing, Executive may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Executive or any of her Affiliates is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 2% or more of any class of securities of such Person. As used herein, **"Restricted Business"** shall mean any business activity relating to or involving cryptocurrency payment processes or facilitation and/or constructing, developing and/or assisting with the creation of a mobile payment solution utilizing cryptocurrencies; and, during the Restricted Period, Executive shall specifically not be permitted to accept any employment position with Bitpay, Coinbase Commerce or any company that offers products or services similar to those companies. **"Territory"** means wherever in the world that the Company or any of its Affiliates engages in the Restricted Business at the time Executive's employment is terminated.

5.4    Non-Solicitation. During Executive's service with the Company and its Affiliates and during the Restricted Period, Executive shall not, directly or indirectly, for Executive's own benefit or for the benefit of any third party, in any capacity (as a principal, shareholder, partner, director, officer, agent, consultant, contractor, employee, lender or otherwise):

(a)    induce, solicit, recruit or attempt to persuade any Person to terminate such Person's employment or other relationship with the Company or any of its Affiliates or not to establish an employment or other relationship with the Company or any of its Affiliates to the extent such Affiliate is involved in the Restricted Business, whether or not such Person is or would be an employee, consultant, contractor, officer and/or director, whether or not such relationship is or would be pursuant to a written or oral agreement and whether or not such relationship is for a specific period of time or is at-will;

(b)    employ or establish a business relationship with (or attempt to employ or establish a business relationship with), or encourage or assist any Person to employ or establish a business relationship with, any individual who was an employee, consultant, contractor, officer and/or director of the Company or any of its Affiliates (to the extent such Affiliate is engaged in the Restricted Business) during the previous 12 months; or,

7

(c)     (i) direct or engage in any act which may interfere with or adversely affect, alter or change the relationship (contractual or otherwise) of the Company or any of its Affiliates with any Person that is a customer, prospective customer, vendor, supplier or contractor of the Company or any of its Affiliates (in the case of an Affiliate, only to the extent that such Affiliate is engaged in the Restricted Business), or (ii) otherwise induce or attempt to induce any such Person to cease doing business, reduce or otherwise limit its business with the Company or any of its Affiliates.

## 5.5     Relief.

(a)     Executive acknowledges and agrees that (i) the covenants set forth in the Section 5 are reasonable and necessary in order to protect the legitimate interests of the Company and its Affiliates, and Executive is receiving adequate consideration hereunder; (ii) the Company will not have any adequate remedy at Law if Executive violates the terms hereof or fails to perform any of the obligations set forth in the Section 5; and (iii) the Company and its Affiliates shall have the right, in addition to any other rights it may have under applicable Law, to obtain from any court of competent jurisdiction preliminary and permanent injunctive relief to restrain any breach or threatened breach of, or otherwise to specifically enforce any such covenant or any of the other obligations set forth in the Section 5 (and Executive hereby waives any right to require any bond or security in connection therewith), as well as to obtain damages. All of these rights and remedies will be in addition to, and not in lieu of, any other rights and remedies available to the Company under Law or in equity.

(b)     If the period of time or scope of any restriction set forth in the Section 5 should be adjudged unreasonable in any proceeding, then the period of time shall be reduced by such number of months or the scope of the restriction shall be modified, or both, by a court of competent jurisdiction so that such restrictions may be enforceable for such time and in the manner to the fullest extent adjudged to be reasonable. If Executive violates any of the restrictions set forth in the Section 5, then the restrictive period shall not run in her favor from the time of the commencement of any such violation until such time as such violation shall be cured by him.

5.6     Returning Company Documents and Property.     Executive shall, upon termination of employment with the Company, for any reason, deliver to the Company, or its designee, and not keep in Executive's possession or deliver to anyone else, any and all records, data, notes, reports, information, proposals, lists, correspondence, emails, specifications, drawings, blueprints, sketches, materials, other documents, or reproductions or copies (including but not limited to on computer discs or drives) of any aforementioned items either developed by Executive pursuant to Executive's employment with the Company and its Affiliates or otherwise relating to the business of the Company and its Affiliates, retaining neither copies nor excerpts thereof. Executive shall also, at such time, or earlier upon request, deliver to the Company, or its designee, all property of the Company and its Affiliates in Executive's possession, including cell phones, computers, computer discs, drives and other equipment or devices, and that if the Executive fails to do so the Company and its Affiliates may withhold from Executive's

8

compensation the replacement cost of property not returned to the fullest extent permitted by Law.

5.7    Non-disparagement.  Executive acknowledges and agrees that Executive shall not, whether in writing or orally, malign, denigrate or disparage the Company or any of its Affiliates or any of their respective predecessors or successors, or any of the current or former directors, officers, employees, shareholders, partners, members, agents or representatives of any of the foregoing, with respect to any of their respective past or present activities, or otherwise publish (whether in writing or orally) statements that tend to portray any of the aforementioned parties in an unfavorable light. Company acknowledges and agrees that it shall use its reasonable efforts to cause its members of the Board and its executive officers not, whether in writing or orally, to malign, denigrate or disparage Executive, or any of his or her Affiliates, or otherwise publish (whether in writing or orally) statements that tend to portray any of the aforementioned parties in an unfavorable light.

5.8    Disclosure of the Section 5.  The Company may disclose the existence and terms of the provisions of the Section 5 to any employer or other service recipient of Executive to or for which Executive may render services following the termination of Executive's providing services to the Company and its Affiliates. Unless otherwise agreed to by the Company in writing, Executive shall disclose the existence and terms of the provisions of the Section 5 to any employer or other service recipient of Executive to or for which Executive may render services following the termination of Executive's providing services to the Company and its Affiliates.

5.9    Acknowledgement. Executive acknowledges and agrees that (a) Executive has had the opportunity to consult with independent counsel of Executive's own choosing concerning the provisions of the Section 5 and has been advised to do so by the Company, (b) Executive has read and understands the provisions of the Section 5, is fully aware of its legal effect, and has entered into it freely based on Executive's own judgment, (c) the duration and scope of the provisions of the Section 5 are reasonable and necessary to protect the customer relationships, trade secrets, proprietary information and other legitimate business interests of the Company and its Affiliates, (d) the Company and its Affiliates would not provide the consideration set forth in the Agreement to Executive unless Executive agrees to be bound by the provisions of the Section 5, and (e) Executive has not relied on any agreements or representations, express or implied, that are not set forth expressly in the Section 5.

## SECTION 6.    MISCELLANEOUS

6.1    Prior Employment.  Executive represents and warrants that he or she is not a party to any other employment, non-competition, joint venture, partnership or other agreement or restriction that could interfere with his or her employment with the Company or his or her rights and obligations under the Agreement and that his or her acceptance of employment with the Company and the performance of her duties under the Agreement will not breach the provisions of any contract, agreement or understanding to which he or she is party or any duty owed by him or her to any person or entity. Executive further represents and warrants that, while an employee of the Company, he or she will not hereafter become a party to or be bound by any such conflicting agreement.

9

6.2    Section 409A Compliance.

(a)    If Executive is a "specified employee" within the meaning of section 409A(a)(2)(B)(i) of the Internal Revenue Code of 1986, as amended (the "**Code**"), at the time of his or her termination of employment, any benefit payable under the Agreement that is considered "nonqualified deferred compensation" under Code Section 409A that is provided to Executive on account of his or her separation from service shall be paid no earlier than six months after his or her separation from service (or, if earlier, her death), and any amount that otherwise would have been paid during the six-month period will be paid in a lump sum on first business day of the seventh month following the month in which her separation from service occurs.

(b)    Any payments to be made under the Agreement upon a termination of the Executive's employment by the Company for Cause or without Cause, or as a result of the Executive's voluntary termination of employment, shall only be made if such termination of employment constitutes a "separation from service" under Code Section 409A.

(c)    Payments and benefits triggered by Executive's "separation from service" from the Company shall be made or initiated, as applicable, within 60 days following such separation from service.

(d)    If Executive experiences a "separation from service" from the Company and the 60-day period following such separation from service begins in one calendar year and ends in a second calendar year (a "**Crossover 60-Day Period**"), and if thee are any payments subject to Code Section 409A due Executive as a result of such separation from service that are: (i) conditioned on Executive executing and not revoking a release of claims and (ii) otherwise due to be paid during the portion of the Crossover 60-Day Period that falls within the first year, then such payments will be delayed and paid in a lump sum during the portion of the Crossover 60-Day Period that falls within the second year; provided such release of claims becomes effective and irrevocable during the Crossover 60-Day Period, if at all.

(e)    For purposes of Section 409A, each installment payment provided under the Agreement shall be treated as a separate payment.

(f)    To the extent required by Code Section 409A, each reimbursement or in-kind benefit provided under the Agreement shall be provided in accordance with the following: (i) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during each calendar year cannot affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year; (ii) any reimbursement of an eligible expense shall be paid to Executive on or before the last day of the calendar year following the calendar year in which the expense was incurred; and (iii) any right to reimbursements or in-kind benefits under the Agreement shall not be subject to liquidation or exchange for another benefit.

(g)    The Agreement shall be interpreted to avoid any additional tax under Section 409A. If any payment or benefit cannot be provided or made at the time specified herein without incurring sanctions under Section 409A, then such benefit or payment shall be provided in full at the earliest time thereafter when such sanctions will not be imposed.

10

6.3     Severability. The invalidity or unenforceability of any particular provision or part of any provision of the Agreement shall not affect the other provisions or parts of the Agreement. If any provision of the Agreement is determined to be invalid or unenforceable by a court of competent jurisdiction, by reason of the duration or geographical scope of the covenants contained in the Agreement, the duration or geographical scope, or both, shall be considered to be reduced to a duration or geographical scope to the extent necessary to cure the invalidity.

6.4     Assignment. The Agreement shall not be assignable by Executive, but shall be assignable by the Company to any Affiliate and to any person or entity that may directly or indirectly become a successor in interest (by purchase of assets or stock or by merger, consolidation or otherwise) to the Company in the business or a portion of the business it presently operates; provided that notwithstanding the foregoing, the Company shall not assign the Agreement to any entity that does not operate exclusively in the Restricted Business without Executive's prior written consent. Subject to the foregoing, the Agreement and the rights and obligations set forth in the Agreement shall inure to the benefit of, and be binding upon, the parties and each of their respective permitted successors, assigns, heirs, executors and administrators.

6.5     Notices. All notices and other communications given or made pursuant to the Agreement and any other documents incorporated herein by reference shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next business day, (c) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth on the signature page hereto, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with the Section 6.5.

6.6     Entire Agreement. The Agreement, together with the Executive Compensation Plan, constitutes the entire agreement between the parties, and all promises, representations, covenants, understandings, warranties and agreements with reference to the subject matter hereof and inducements to the making of the Agreement relied upon by any party hereto, have been expressed in the Agreement or in the documents incorporated in the Agreement by reference. Any employment agreement, consulting agreement or other services arrangement between the Company and Executive existing prior to the Effective Date shall be amended, restated, replaced and superseded in its entirety by the Agreement.

6.7     Amendments and Waivers. The Agreement, or any of its terms, covenants, agreements, conditions or provisions, may be amended or waived (either generally or in a particular instance and either retroactively or prospectively), upon the written consent of Executive and the Company; provided, however, that no waiver or consent on any one instance shall be deemed to be or be construed as a further or continuing waiver of any such term or condition unless it expressly so provides. Neither the failure nor any delay on the part of any party to exercise any right, remedy, power or privilege shall operate as a waiver thereof.

11

6.8     Governing Law.     The Agreement and all aspects of Executive's employment by the Company shall be governed by and interpreted and enforced in accordance with the substantive laws of the State of Delaware (including, without limitation, provisions concerning limitations of actions), without reference to the conflicts of laws rules of that or any other jurisdiction, except that federal Law shall also apply to the extent relevant.

6.9     Consent to Jurisdiction.     Subject to the requirement to arbitrate set forth in Section 6.11, any legal suit, action or proceeding arising out of or based upon the Agreement or any other aspect of Executive's employment or the termination thereof, shall be instituted in the Federal Courts of the United States of America or the Courts of the State of Delaware in each case located in the City of Wilmington and the County of New Castle, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court unless and until such courts have refused to accept such jurisdiction. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

6.10     Waiver of Jury Trial.     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THE AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEEFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THE AGREEMENT. EACH PARTY TO THE AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHE PARTY HAS REPRESENTED, EXPRESSLY OR OTHEWISE, THAT SUCH OTHE PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THE WAIVER, (C) SUCH PARTY MAKES THE WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THE AGREEMENT BY, AMONG OTHE THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THE SECTION.

6.11     Arbitration.     Except to enforce the restrictive covenants in Section 5, or in such other instances where either party seeks injunctive relief, any dispute, controversy or claim arising out of or related to the Agreement or the breach of the Agreement, or out of any other aspect of Executive's employment or separation therefrom, including but not limited to compensation, discrimination, and/or retaliation claims of any type, whether such claims arise by contract, statute, common law, equity, or otherwise, shall be submitted to and decided by binding arbitration in Wilmington, Delaware. Arbitration shall be administered exclusively by the American Arbitration Association and shall be conducted consistent with the rules, regulations and requirements thereof as well as any requirements imposed by state Law. Any arbitral award determination shall be final and binding upon the parties to the Agreement.

12

6.12     Headings; Counterparts. The headings of paragraphs in the Agreement are for convenience only and shall not affect its interpretation. The Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to constitute but one and the same Agreement. The parties hereto may deliver the Agreement by facsimile signature, and each party shall be permitted to rely upon the signatures so transmitted to the same extent and effect as if they were original signatures.

6.13     Legal Fees for Enforcement of Agreement. In any dispute, controversy or claim involving enforcement of the terms of the Agreement, including in any arbitration referred to in Section 6.11 above, the prevailing party shall be entitled to reimbursement of all reasonable legal, court and arbitration fees and expenses from the non-prevailing party.

6.14     Further Assurances.     Each of the parties shall execute such further instruments and take such other actions as the other party shall reasonably request in order to effectuate the purposes of the Agreement.

6.15     Survival. No termination of employment under Section 4 shall relieve Executive of her obligations set forth under Sections 5 and 6 of the Agreement.

[Signature Page Follows]

13

IN WITNESS WHEREOF, the parties have executed the Agreement as of the date first
written above.

COMPANY:

FLEXA TECHNOLOGIES, LLC

*Danny McCabe*

By_____

Name: ~~Kathleen-Pierce-Gilmore~~   Daniel C. McCabe
Title: ~~Chief Executive Officer~~   General Counsel

EXECUTIVE:

*Scott Mandel*

Address:

3903 Greenbank Lane
Newtown Square, PA 19073

Email address:

scottmandel@gmail.com

[Signature Page to Employment Agreement]

# EXHIBIT B

## ADVISOR AGREEMENT

THIS ADVISOR AGREEMENT (the "Agreement") is made effective as of May 19th , 2018, by and between Flexa Technologies LLC, a Delaware limited liability company (the "Company"), and Scott Mandel (the "Advisor").

WHEREAS, the Company's members (the "Members") desire to obtain the services, advice and counsel of the Advisor regarding the Company's business matters within the Advisor's experience and expertise, the Company's actual or potential business, technology and products, without limitation; and

WHEREAS, the Company would like to engage the Advisor to act as an Advisor to the Company, and the Advisor is willing to provide advice and services to the Company on the terms and conditions of this Agreement; and

WHEREAS, the Company has spent significant time, effort and money to develop certain Confidential Information (as defined herein) which the Company considers vital to its business and goodwill;

WHEREAS, the Company wishes to protect and preserve the confidentiality of such Confidential Information and protect it from misuse;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     Service as an Advisor. The Advisor shall serve as an advisor to the Company on a non-exclusive basis for the term of this Agreement. The Advisor shall perform services hereunder as an independent contractor and not as an employee, agent, joint venturer or partner of the Company. The Advisor shall have no power or authority to act for, represent or bind the Company or its affiliates in any manner whatsoever, except as set forth in this Agreement or as may be expressly agreed on each occasion, in writing, by the Company or the Members. The Advisor agrees to take no action that expresses or implies that the Advisor has such power or authority, except as set forth in this Agreement or as may be expressly agreed on each occasion in writing, by the Company or the Members.

2.     Duties. During the term of this Agreement, the Advisor will provide the Company together with the Company's subsidiaries and affiliates with advice and counsel regarding the business of the Company, its subsidiaries and affiliates within the Advisor's experience and expertise, including without limitation, the Company's actual or potential business. In addition, during the term of this Agreement, the Advisor shall assist the Company in the pre-sale of Flexacoin ("FXC") to pre-sale buyers of FXC, including without limitation, marketing FXC as a utility coin for use on the Flex Network Protocol to potential pre-sale buyers of FXC to raise Ethereum (or US Dollar, or other cryptocurrency) for the Company. The Advisor will report directly to the Members of the Company in the course of performing the Advisor's duties, unless otherwise expressly directed by the Members.

3. <u>Term</u>. This Agreement shall have a term of three (3) months. The provisions of Section 4.1, Section 6, and Section 7 shall survive the termination and/or expiration of this Agreement. Notwithstanding anything to the contrary herein, in the event that Advisor provides advisory or any other services as an employee, consultant or otherwise to a Competing Business (which is any business developing, selling or utilizing cryptocurrency payment processing technology), the Company may, at its option, terminate this Agreement immediately upon notice to Advisor.

4. <u>Fees</u>.

4.1 As compensation for the Advisor's services under this Agreement, the Company shall pay the Advisor: a) that amount of FXC having an approximate U.S. Dollar value equivalent of Two Million U.S. Dollars ($2,000,000) at the time of issuance to Advisor (the "Initial FXC Payment") if Advisor's services and efforts contribute to the Company receiving no less than Fifty Six Thousand Six Hundred Sixty-Seven (56,667) in pre-sale Ethereum (or its equivalent) placements with the Company from pre-sale buyers of FXC (the "Initial ETH Payment"); and b) that bonus amount of FXC having an approximate U.S. Dollar value equivalent of Two Million U.S. Dollars ($2,000,000) at the time of issuance to Advisor (the "Bonus FXC Payment") if Advisor's services and efforts contribute to the Company receiving no less than Eighty Five Thousand (85,000) in pre-sale Ethereum (or its equivalent) from pre-sale buyers of FXC (the "Bonus ETH Payment"). The Initial FXC Payment shall be due and owing to Advisor within seven (7) days of the Company's confirmation of the receipt, acceptance, and clearance of the Initial ETH Payment, and the Bonus FXC Payment shall be due and owing to Advisor with seven (7) days of the Company's confirmation of the receipt, acceptance, and clearance of the Bonus ETH Payment. Advisor's Initial FXC Payment and Bonus FXC Payment shall be subject to potential market fluctuations and/or volatility. The Company shall not be responsible for withholding or paying any income, payroll, Social Security or other federal, state or local taxes, making any insurance contributions, including unemployment or disability, or obtaining worker's compensation insurance on the Advisor's behalf. However, the Company may file informational returns with the appropriate federal and state agencies regarding such payments. The Advisor agrees to pay all federal, state and local taxes applicable to any compensation paid to the Advisor pursuant to this Agreement. The terms and provisions of this Section 4.1 shall survive termination or expiration of this Agreement.

5. <u>Notification</u>. The Advisor agrees to promptly notify the Company in the event of any situation or problem that comes to the Advisor's attention concerning the business of the Company, including but not limited to its relationship with business partners, customers or the Company's product performance, or any other matter involving the Company.

6. <u>Conduct</u>. The Advisor shall use reasonable efforts and good faith to comply with and conduct all Company business activities in accordance with any and all applicable laws, ordinances and regulations and agrees not to intentionally conduct any business activities that may be injurious to the Company's business, reputation or goodwill.

7. <u>Advisor Indemnification</u>. In the performance of services, the Advisor shall be obligated to act only in good faith. The Advisor agrees to indemnify and hold harmless the Company, its Members, managers, employees, directors, principal and representatives from and

2

against any and all losses, claims, costs, expenses, judgments, damages or liabilities, joint or several, to which the Company or its Members may become subject (including the costs of any investigation and all reasonable attorneys' fees and costs) or incurred by the Company, in connection with any pending or threatened litigation, legal claim or proceeding arising out of or in connection with the willful misconduct and/or material breach of this Agreement by the Advisor.

8. Company Indemnification. The Company agrees to indemnify and hold harmless the Advisor from and against any and all losses, claims, costs, expenses, judgments, damages or liabilities, joint or several, to which the Advisor may become subject (including the costs of any investigation and all reasonable attorneys' fees and costs) or incurred by the Advisor, in connection with any pending or threatened litigation, legal claim or proceeding arising out of or in connection with the Advisor's performance of his duties under this Agreement or the willful misconduct and/or material breach of this Agreement by the Company. The terms and provisions of this Section 8 shall survive termination or expiration of this Agreement.

9. Confidential Information; Developments.

9.1 As used in this Agreement, "Confidential Information" means any and all confidential or proprietary technical, trade and business information furnished, in any medium, or disclosed in any form or method, including orally, by the Company or the Company's subsidiaries or affiliates to the Advisor, or discovered by the Advisor through any means, including observation, including, but not limited to, information about the employees, officers, directors, suppliers, customers, affiliates, businesses and business relationships of the Company, its subsidiaries and affiliates; manufacturing processes and methods, operating technique, practice, course of dealing, plan or strategy, sources of supply, customer lists and markets; sales, profits, pricing, other financial data and know-how; financial projections, business plans, marketing plans, marketing materials, logos and designs; personnel statistics; research; computer hardware and software; blockchain and/or cryptocurrency concepts, design, construction, plans, inventions and ideas; current and future products, designs, developments, capabilities, inventions, prototypes, models, drawings, specifications, methods and trade secrets; technical data, inventions, processes, algorithms, formulae, franchises, databases, computer programs, user interfaces, source codes, object codes, architectures and structures, display screens, layouts, development tools and instructions, templates and other trade secrets; and such other information normally understood to be confidential or otherwise designated as such in writing by the Company, its subsidiaries and affiliates, as well as information discerned from, based on or relating to any of the foregoing which may be prepared or created by the Advisor. Confidential Information shall not include:

(i) information that is publicly available as of the date of this Agreement; or

(ii) information that subsequently becomes publicly available or generally known in the industry through no fault of the Advisor, provided that such information shall be deemed Confidential Information until such time as it becomes publicly available or generally known.

9.2 The Advisor shall retain all Confidential Information in trust for the sole benefit of the Company, its subsidiaries and affiliates, and their successors and assigns, and shall comply

3

with any and all procedures adopted from time to time to protect and preserve the confidentiality of any Confidential Information. The Advisor shall not at any time, during or after the term of this Agreement, directly or indirectly, divulge, use or permit the use of any Confidential Information. Advisor agrees to employ steps to protect Confidential Information from unauthorized or inadvertent disclosure, but at a minimum to the same extent as the Advisor protects the Advisor's own confidential information. Upon expiration or termination of this Agreement and upon the Company's request during the term of this Agreement, the Advisor shall promptly return any and all tangible Confidential Information (whether written or electronic) to the Company, including all copies, abstracts or derivatives thereof.

9.3     The Company shall own all right, title and interest relating to all inventions, improvements, discoveries, methods, developments, software, and works of authorship, whether patentable or not, which are created, made, conceived or reduced to practice by the Advisor or jointly with others in the course of the Advisor's performance of services under this Agreement or using the Confidential Information of the Company, its subsidiaries and affiliates (collectively, "Developments"). The Advisor agrees to make full and prompt disclosure to the Company of all Developments and provide all Developments to the Company. Advisor hereby assigns to the Company or its designee all of the Advisor's right, title and interest in and to any and all Developments. The Advisor agrees to cooperate fully with the Company, both during and after the term of this Agreement, with respect to the procurement, maintenance and enforcement of intellectual property rights (both in the United States and foreign countries) relating to any Developments. The Advisor shall sign all documents which may be necessary or desirable in order to protect the Company's rights in and to any Development, and the Advisor hereby irrevocably designates and appoints each officer of the Company as the Advisor's agent and attorney-in- fact to execute any such documents on the Advisor's behalf, and to take any and all actions as the Company may deem necessary or desirable in order to protect its rights and interests in any Development.

9.4     The Advisor acknowledges that the Company competes with other businesses that are or could be located anywhere; that the provisions of this Agreement are reasonable and necessary to protect and preserve the Company's business interests; and that the unauthorized disclosure, use or disposition of any Confidential Information in breach of this Agreement may cause irreparable harm and significant injury for which there is no adequate remedy at law. Accordingly, the parties agree the Company shall have the right to immediate injunctive relief in the event of any breach or threatened breach of the obligations in this Section 8, without security or bond, in addition to any other remedies that may be available to the Company at law or in equity. The terms and provisions of this Section 8 shall survive termination or expiration of this Agreement.

10.     Publicity. The Company shall have the right to use the name, biography and picture ("Likeness") of the Advisor on the Company's website, white paper, and/or Company marketing documents.

11.     No Conflicts. The Advisor represents and warrants to the Company that the Advisor is free to enter into this Agreement and the services to be provided pursuant to this Agreement are not in conflict with any other contractual or other obligation to which the Advisor is bound.

4

12. <u>Notices</u>. Notices may be delivered in writing, via email and/or regular U.S. Mail.

13. <u>Parties in Interest</u>. This Agreement is made solely for the benefit of the Advisor and the Company and the Members. No other person shall acquire or have any right under or by virtue of this Agreement.

14. <u>Entire Agreement; Amendments; Severability; Counterparts</u>. This Agreement constitutes the entire agreement and understanding of the parties, and supersedes any and all previous agreements and understandings, whether oral or written, between the parties with respect to the matters set forth in this Agreement. No provision of this Agreement may be amended, modified or waived, except in a writing signed by the parties. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision, and if any restriction in this Agreement is found by a court to be unreasonable or unenforceable, then such court may amend or modify the restriction so it can be enforced to the fullest extent permitted by law. The section headings in this Agreement have been inserted as a matter of convenience of reference and are not a part of this Agreement. This Agreement may be executed by electronic signature in any number of counterparts, each of which together shall constitute one and the same instrument.

15. <u>Assignment</u>. This Agreement shall not be assigned and is not assignable by any party hereto.

16. <u>Applicable Law; Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without giving effect to conflict of law principles. Any action arising out of this agreement shall be brought exclusively in a court of competent jurisdiction located in Cook County, Chicago, Illinois.

17. <u>Authority</u>. This Agreement has been duly authorized, executed and delivered by and on behalf of the Company and the Advisor.

[SIGNATURE PAGE FOLLOWS]

5

DocuSign Envelope ID: D00BA10C3-857E-431F-8A6D-HD8B0C484698

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

COMPANY:

Flexa Technologies LLC,
a Delaware limited liability company

By:_____

Name: Kathleen Pierce-Gilmore

Title: CEO


ADVISOR:

Scott Mandel

Scott Mandel

6