# **EXHIBIT C**

| | |
|---|---|
| **Subject:** | RE: Flexa Network Inc. v. Scott Mandel - Case 01-19-0002-2676 |

**From:** Justin Brooks <JBrooks@gbblegal.com>
**Date:** September 5, 2019 at 11:38:07 AM EDT
**Subject: RE:  Flexa Network Inc. v. Scott Mandel - Case 01-19-0002-2676**

Hello, Erik. Hope you are well. As we have informed the Blank Rome attorneys, we are not participating in arbitration. The employment agreement that contains the arbitration clause is not valid and is not a legal or enforceable contract. We are ready to file a complaint in court but will endeavor to resolve this dispute with Flexa's attorneys (outside the arbitration process) and have made overtures to do so. We will not involve AAA in that process, but I am providing a bit more facts and color below (excerpted from another larger document that need not be provided to AAA).

Scott Mandel met Flexa's Co-Founder and Chief Technology Officer Tyler Spalding roughly 10 years ago at a startup event in Chicago, Illinois. Over the next decade, Mandel and Spalding stayed in touch.  During this period, Spalding started a crypto mining venture, founded and exited a small technology company, invested in several startups, and became Chief Technology Officer ("CTO") at Raise.  On or around January 18, 2018, while still CTO at Raise, Spalding conversed with Mandel through the online platform Telegram, asking him "how much sway" he thought he could have "in ICO funding" and explaining that he was "working on coin with an elite team". He also stated that if asked he would "deny any of this." The overwhelming majority of Flexa's "elite team" was also employed by Raise at the time the idea and business plan for Flexa was conceived.[1]

On January 19, 2018, Spalding told Mandel that he already had partnerships in place for Flexa (despite serving as CTO for Raise into January of 2018). These partnerships became a major selling point for Flexa.  Without obtaining written permission, Flexa used more than twenty-five (25) major retailers' names and logos, including the logo for Starbucks, in its private security offering website.[2] The logos were removed near the end of the token offering in fall of 2018.

In addition to attempting to understand the partnership relationships, Mandel attempted to undertake due diligence on the technology platform as he discussed a potential role at Flexa with Spalding. Spalding expressly stated that Flexa's payment processing systems was "not a gift card system" but rather "prepaid/debit rails."  Spalding's representations regarding Flexa's purported partnerships and technology were significant draws for Mandel, and these representations were the driving force behind Mandel's ultimate decision to join Flexa in May of 2018.

*Mandel's Contractual Agreements with Flexa*

Over the course of his relationship with Flexa, Mandel has been presented with 5 agreements by Flexa, most of them never executed by Flexa.

Mandel began his capital raising efforts for Flexa in late April 2018 by discussing Flexa's business model with and getting feedback from these investors.  On or about May 19, 2018 Mandel formally joined Flexa as its Director of Community.  Chief Executive Officer Kathleen

Pierce-Gilmore counter-executed the Advisor Agreement on behalf of Flexa, and it was fully executed by May 21, 2018. The Advisor Agreement dictated that Mandel would "assist [Flexa] in the pre-sale of Flexacoin ("FXC") to pre-sale buyers of FXC, including without limitation, marketing FXC as a utility coin for use on the Flex Network Protocol to potential pre-sale buyers of FXC to raise Ethereum (or US Dollar, or other cryptocurrency) for the Company." This Advisor Agreement had a term of three (3) months and was to be governed by the laws of Illinois. For his efforts under this agreement, Mandel was to receive "a) that amount of FXC having an approximate U.S. Dollar value equivalent of Two Million U.S. Dollars ($2,000,000) at the time of issuance to Advisor (the "Initial FXC Payment") if Advisor's services and efforts contribute to the Company receiving no less than Fifty Six Thousand Six Hundred Sixty-Seven (56,667) in pre-sale Ethereum (or its equivalent) placements with the Company from pre-sale buyers of FXC (the "Initial ETH Payment"); and b) that bonus amount of FXC having an approximate U.S. Dollar value equivalent of Two Million U.S. Dollars ($2,000,000) at the time of issuance to Advisor (the "Bonus FXC Payment") if Advisor's services and efforts contribute to the Company receiving no less than Eighty Five Thousand (85,000) in pre-sale Ethereum (or its equivalent) from pre-sale buyers of FXC (the "Bonus ETH Payment")." This compensation entitlement was to "survive the termination and/or expiration of [the Advisor] Agreement."

On or about June 4, 2018, Flexa executed a revised Advisory Agreement that differed from the original agreement in a number of ways, including alteration to the compensation provisions to account for the potential volatility in the price of Ethereum. Around this same period, Flexa decided to move from private utility token sale that was to be offered worldwide to most investors to a security token sale governed by Rule 506(b).[3] However, when Mandel asked Flexa's General Counsel Daniel McCabe about the changed approach, he responded in email that Flexa's utility "remains a pure utility coin [that] can be described as such" and that Flexa need not identify itself as a security to buyers as it was simply "a 'utility coin' that opted in an abundance of caution to file a 506B exemption." In fact, Flexa routinely sold tokens to people outside of its network, sold tokens to people with whom it had no preexisting relationship, did nothing to verify accreditation of any buyers, and promoted its offering through various channels. In hindsight and with the benefit of having done additional research, Mandel now believes that Flexa violated the securities laws in a number of ways. At the time, he was pacified by McCabe's assurances and continued raising capital.

Almost immediately after presenting the revised Advisor Agreement, Flexa reversed course and presented Mandel with a purported employment agreement on June 16, 2018. The purported rationale that Flexa communicated to Mandel was that he was operating as an unregistered broker dealer and would need to become an employee for the protection of the company and himself. There was not a single oral or written communication to Mandel stating that he was being asked to transition to an employee because of performance deficiencies. Nor did any of the founders express dissatisfaction with his work. Mandel signed the Employment Agreement on July 22, 2018. Flexa did not sign this agreement in July. Flexa did not sign this agreement in August. Flexa did not sign this agreement in September. On the contrary, Mr. McCabe sent Mandel another advisory agreement on October 3, 2018. Under the terms of this agreement, Mandel was to receive 1,000,000,000 (One Billion) Flexacoins upon execution, $27,692.64 upon 250,000,000 Flexacoin one year after execution and 250,000,000 Flexacoin two years after execution. This agreement is a testament to how highly Flexa valued Mandel's services. This amount of Flexacoin represented anywhere from $6 million to $10 million in the 2019 timeframe after the raise concluded. After further discussions with McCabe regarding compensation and other terms, further revisions were made.

On October 5, 2018, Flexa sent Mandel a revised Advisor Agreement.  Under this Agreement, Flexa was to pay Mandel "1,400,000,000 (One Billion Four Hundred Million) Flexacoins upon the issuance of Flexacoin" and the timing of issuance was "at the Company's sole discretion" (however Flexa anticipated that issuance would take place shortly after the conclusion of the raise.  Under the terms of Flexa's October 5, 2018 proposal, Mandel would also receive $34,520.55 within seven days of the execution of this Agreement.  In connection with circulating this agreement, McCabe wrote the following to Mandel (in all caps) in an October 5, 2018 email: "**WE APPRECIATE YOUR PATIENCE IN RIDING THIS OUT WITH US WHILE OUR ICO CHANGED COURSE, OUR BUSINESS PIVOTED, OUR CEO WAS TRANSITIONED OUT, ALL OF THE THINGS THAT CAUSED OUR DELAY IN SIGNING YOU UP. THAT PATIENCE WAS NOTICED AND IS APPRECIATED, HENCE THE MASSIVE PAYMENT BEING OFFERED TO YOU IN OUR ADVISOR AGREEMENT PROPOSAL.**"

11 days later, McCabe stated the following in an October 16, 2018 email:

> "my DLA Piper attorneys as well as a Greensfelder attorney who specializes in broker / dealer issues (including the safe harbor provision), have given me their analysis and opinions since we last spoke. A few points resulting therefrom: a) most importantly, since you were not an employee during your prior work for Flexa (March 2018 - today), we cannot now backdate you into being an employee in order to somehow protect you or Flexa (even if we tried, there was never any W2 pay, withholdings, anything that an employee would have received, so impossible to fake), so the safe harbor is irrelevant for us since you were not an employee when you started, and would only be made an employee now, after your prior work for Flexa was complete; and, b) also, we do not need any safe harbor since you were never a broker dealer for Flexa specifically, you were never paid any brokerage, commission, or transactional-based pay that was ever calculated through any sales or buyer dollars brought in etc."

Around the same time, Spalding unilaterally changed the Flexacoin Pricing Model, in a manner that was contrary to term of Flexa's Whitepaper and offering materials.  Specifically, he changed the price of FXC from 1ETH = 500,000 FXC to $500 = 500,000FXC. This change along with the reaffirmation of Mandel's status as an advisor exposed Mandel to massive tax liability.  Inexplicably, after repudiating it just three days earlier, McCabe signed the defunct employment agreement on October 19, 2019. Shortly thereafter, on October 31, 2018, in a Telegram communication with Mandel, Spalding then stated that "there needs to be another kind of agreement" and expressed concerns about the tax consequences if Mandel was to be treated as an employee. When Mandel suggested treating and paying him as an advisor as originally anticipated, Spalding responded "That won't fly, because it's clearly subverting paying as an employee. That makes it worse than the situation you were trying to avoid."

In short, Flexa has never taken a consistent and legally sound position on the nature of its relationship with Mandel. Nor did it ever execute a legally sound, viable contract that was the product of a meeting of the minds and based on truthful representations about the nature of its business and the role Mandel would play in it.  Rather, it arbitrarily and unilaterally categorized and recategorized Mandel at its whim to avoid detection of potential legal violations, avoid taxes, and pay Mandel as little as possible, all while benefiting from the investors Mandel convinced to invest in Flexa, strategic introductions, industry knowledge, development of Flexa's token model, and market due diligence.

Justin S. Brooks
Guttman, Buschner & Brooks PLLC

---

**From:** ErikGoss@adr.org [mailto:ErikGoss@adr.org]
**Sent:** Thursday, September 5, 2019 11:25 AM
**To:** Orlacchio@blankrome.com; dmbarry@blankrome.com; Justin Brooks <JBrooks@gbblegal.com>
**Subject:** Flexa Network Inc. v. Scott Mandel - Case 01-19-0002-2676

Hello,

Please review the attached correspondence regarding the above-referenced case.

Feel free to contact me with any questions, comments or concerns you have related to this matter.

Thank you.



**AAA Erik Goss**
**Manager of ADR Services**

American Arbitration Association

T: 404 320 5147   F: 877 395 1388   E: ErikGoss@adr.org
2200 Century Parkway, Suite 300, Atlanta, GA 30345
adr.org  |  icdr.org  |  aaamediation.org



The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

---

[1] Investors repeatedly expressed concern that Flexa's management team had misappropriated technology from Raise in communications with Mandel.
[2] Mr. McCabe acknowledged this was improper in communications with Mandel on or about May 22, 2018.
[3] 506(b) of Regulation D is considered a "safe harbor" under Section 4(a)(2). It provides objective standards that a company can rely on to meet the requirements of the Section (a)(2) exemption. Under Rule 506(b), companies may raise an unlimited amount of money and sell securities to an unlimited number of accredited investors, but in return, they are prohibited from general advertising and solicitation and are limited as to the number of unaccredited investors they can sell to. These and other limitations would make Mandel's job far more difficult.